George Thomas FRANKLIN, Petitioner,

v.

William DUNCAN, Warden, Respondent.

No. C–94–1430 DLJ.

United States District Court,
N.D. California.

April 4, 1995.

Dennis P. Riordan, of Riordan & Rosenthal, San Francisco, CA, for petitioner.

Deputy Atty. Gen. Bruce Ortega, San Francisco, CA, for respondent.

## ORDER

JENSEN, District Judge.

On December 21, 1994, the Court heard arguments on George Thomas Franklin's petition for a writ of habeas corpus. Having considered the arguments of counsel, the papers submitted, the applicable law, and the entire record herein, the Court GRANTS Franklin's petition for a writ of habeas corpus.

## I. INTRODUCTION

On September 22, 1969, eight-year-old Susan Nason disappeared from her Foster City home. Her body was found in December 1969 not far off a road in a mountainous area several miles from her home. She had been beaten to death. The murder investigation remained open for many years. In November 1989, Eileen Franklin–Lipsker ("Franklin–Lipsker"), who had been a schoolmate of Susan Nason, contacted the San Mateo County Sheriff's Office, anonymously at first, and told them that she was an eye witness to the murder. Franklin–Lipsker told the police that the murderer was her father, George Franklin ("Franklin"), the petitioner in this habeas corpus proceeding. Based upon this report and the subsequent trial testimony of his daughter, Franklin was arrested, tried, and convicted of first degree murder in San Mateo County Superior Court in November 1990. He was sentenced under California law to life in prison in January 1991.

■ This is a "recovered memory" case, in that Franklin–Lipsker explained that twenty years after the event, one afternoon in early 1989 after looking at her daughter, she first remembered what she had seen in 1969. There has been a great deal of review and reflection in the mental health field on this subject in recent times. Petitioner cites to several recent articles critical of the notion of "recovered memory." This developing body of thought, however, is not of controlling effect in this case. The judicial task of this Court is to determine whether or not the petitioner was actually prejudiced by trial conduct in violation of the United States Constitution. It was clear at the time of the trial, as it is today, that reliance by a jury on "recovered memory" testimony does not, in and of itself, violate the Constitution. Then as now, such testimony is admitted into evidence and is then tested as to credibility by the time-honored procedures of the adversary system. Admissibility of the memory is but the first step; it does not establish that the memory is worthy of belief. In this regard mental health experts will undoubtedly, as they must, continue their debate on whether or not the "recovered memory" phenomenon exists, but they can never establish whether or not the asserted memory is true. That must be a function of the trial process.

By definition, trials are based on memories of the past. The recognition that memory grows dim with the passage of time is part and parcel of the trial system. Jurors are instructed that in assessing credibility they are to consider the ability of the witness to remember the event with the implicit assumption that asserted memories of events long past must be subject to rigorous scrutiny. From the common sense perspective of the trial process, then, a memory which does not even exist for a long passage of time and then is "recovered" must be at least subject to that same rigorous scrutiny.

This case, then, may be described as a "recovered memory" case, but in reality it is a "memory" case like all others. After direct and cross examination, after consideration of extrinsic evidence that tends to corroborate or to contradict the memory, the focus must be on the credibility, the believability, the truth of the asserted memory. More specifically, from the perspective of this reviewing Court, the focus must be on the test of the credibility of the asserted memory which was conducted in the trial itself. Was it fair? Was it, or was it not, tainted by impermissible violation of Constitutional principles?

This Court will discuss a number of errors in the trial—some of Constitutional dimension, some not. Errors are inevitable companions of trials. Perfection is an abstraction not a reality in the human context of the trial. In this trial, there are two salient errors of Constitutional dimension of fundamental concern to this Court. For one, the prosecution was allowed to introduce evidence, asserted to be corroborative of credibility, of an occasion when the petitioner, after being told of his right to remain silent, actually remained silent in the face of his daughter's jail house accusation of guilt. Moreover, the prosecutor was permitted to argue that this circumstance "compellingly" proved his guilt, and the court instructed the jury that this circumstance could be considered by the jury as an admission of the petitioner's guilt. Introduction of this evidence was in violation of the United States

Constitution. The evidence should not have been introduced, the argument should not have been made, the instruction should not have been given. On the other hand, the defense was denied the ability to introduce evidence, asserted to be contradictory of credibility, that the specifics of the daughter's memory asserted in her trial testimony had in fact been reported in the public media before her testimony. Here again, the prosecutor was permitted to argue, after the evidence had been excluded, that the memory described to the jury could only have been produced by a person who actually witnessed the event. Exclusion of this evidence violated the United States Constitution.

The State contests these errors and argues that, in any event, any Constitutional error should not affect the verdict as it must be considered legally harmless. This Court must disagree. These errors ineffably skewed the test of credibility presented to the jury in the conduct of this trial. This is a tragic event which cries out for resolution, but it cannot be resolved by a trial where violations of the Constitution have eliminated the necessary presence of fundamental fairness. The conviction must be reversed.

## II. BACKGROUND

### A. *Procedural History*

George Thomas Franklin petitions this Court under 28 U.S.C. § 2254 for a writ of habeas corpus. Petitioner was charged on November 28, 1989 with the murder of Susan Nason, a violation of California Penal Code § 187. Petitioner was convicted of first degree murder, following trial by jury, on November 30, 1990 in San Mateo County Superior Court. Petitioner was sentenced to state prison for life on January 29, 1991.

Petitioner has properly exhausted his state court remedies. He timely appealed to the state court of appeal and contemporaneously filed a writ of habeas corpus in that court. The court affirmed petitioner's conviction and denied his writ petition on the merits on April 2, 1993. *People v. Franklin,* No. A052683 (1st App.Dist.Div. 1). His petition for rehearing was denied on May 3, 1993. The California Supreme Court denied his petition for review and his writ petition on July 15, 1993.

### B. *Factual Background: The Trial*

Susan Nason disappeared shortly after 3 p.m. on September 22, 1969 following a visit to the home of a friend in Foster City. When Nason did not return home as planned, her parents initiated a search and contacted the police at approximately 8 p.m. The search for Nason continued without success until December 2, 1969, when her body was discovered by a "watershed keeper" for the City and County of San Francisco Water Department in the "Crystal Springs Watershed Area" of San Mateo County. During a routine patrol, the keeper stopped at a turnout on the south side of Highway 92 about "a mile and a half west of the Crystal Springs Reservoir." He went to the edge of the turnout and looked down the embankment along a narrow trail descending into thick brush. He noticed clothing and "an old bed springs" on the ground. Upon further examination, he found skeletal remains of the body of a small child in the bushes near the bed springs. He immediately contacted his office, which then notified the sheriff's department of the discovery of the body.

Subsequent examination of the body at the scene revealed that one hand "had a ring on it" which was crushed and missing the stone. Near the body were found an orthodontic retainer, a "small portion of hair," a rock with hair on it, one shoe, one sock on a foot and another hanging in a bush five to ten feet away. A rock was found "[w]ithin the folds" of the dress, which had been "pulled up around the waist area." The body was identified as Nason's by dental records. Nason's mother identified the ring, shoe, and dress as items Nason was wearing when she disappeared.

According to the testimony of a pathologist, Nason died as the result of "blunt force impact trauma" to the rear portion of the skull inflicted by at least two blows with an object, such as the rock found in her dress. Nason's right hand was "quite distorted," with injuries to the soft tissues, loss of some bones and "discoloration on the articular surfaces of the wrist bones." In the opinion of

the pathologist, the right hand suffered a "defense-type injury" which occurred during "an attempt to ward off an attack."

The murder of Susan Nason remained unsolved for twenty years. In January of 1989, Eileen Franklin–Lipsker, one of petitioner's daughters, claimed to have first remembered that she had witnessed the murder of Nason many years before. Franklin–Lipsker was the primary prosecution witness against petitioner. She testified that she saw her father sexually assault and kill Nason, her "favorite playmate," and that she then repressed that memory for twenty years. She was the only eyewitness to the crime. No physical evidence was found tying Franklin to the crime.

### 1. *Franklin–Lipsker's Testimony*

Franklin–Lipsker testified that on September 22, 1969, when she was eight years old, she and her father picked up Nason in her father's Volkswagen van. She and Nason were playing as her father drove, and her next memory was of seeing the Crystal Springs reservoir off Highway 92 near Half Moon Bay.

Franklin–Lipsker testified that petitioner parked the van at the turnoff near the reservoir and got in back with the two girls. He then got on top of Nason, held her hands over her head, and began rubbing his pelvis against hers. Nason was "struggling" and "whimpering." Franklin–Lipsker became "very scared." Franklin–Lipsker said she next saw her father outside the van with Nason. He approached Nason as she crouched on the ground crying, then struck her in the head with a rock. Franklin–Lipsker testified that Nason's hand was bloody, with a "smashed" silver ring. She saw some hair that was "no longer attached to the body." Petitioner next tried to remove a mattress from the back of the van, and then went "down below" and began covering up Nason's body.

Franklin–Lipsker testified that her father told her that she had to forget what hap-

pened; that no one would believe her; that she would be blamed; and that he would kill her if she told anyone. Franklin–Lipsker testified to other acts of violence and physical and sexual abuse by her father directed at her and her siblings and mother throughout her childhood.[1]

Franklin–Lipsker testified that in January 1989, the memory of the murder suddenly began to come back to her as she watched her daughter playing on the floor. She first disclosed the memory of the murder to one of her therapists, Kirk Barrett, in June 1989, to her brother George in August of 1989, to her sister Janice in September of 1989, to her mother in October of 1989, to a criminal attorney in November 1989, and then to her husband. Her husband contacted the police. He did so without her knowledge or consent. After four anonymous conversations with the police, she revealed to them her identity and the identity of the murderer.

Petitioner was arrested for the murder of Susan Nason on November 28, 1989. The police arrived at petitioner's house and advised him that they "were investigating an old homicide case involving a subject by the name of Susan—Susan Nason." Petitioner responded, "Have you talked to my daughter?"

### 2. *Expert Testimony*

Both the prosecution and the defense presented expert testimony regarding whether it was plausible that Franklin–Lipsker saw her father murder her best friend, and then involuntarily repressed the memory for twenty years. The prosecution's expert witness was Dr. Lenore Terr. Petitioner's expert witnesses were Dr. David Spiegel and Elizabeth Loftus, Ph.D.

#### a. *Dr. Terr's Testimony*

Dr. Terr, a psychiatrist and professor at the University of California at San Francisco, testified that she had treated many patients who had repressed memories of traumatic childhood events. She described the process

---

1. Leah Franklin, Franklin–Lipsker's mother and petitioner's former wife, also testified that petitioner abused Franklin–Lipsker and the other children both verbally and physically, although petitioner and Franklin–Lipsker otherwise had a

"very close" relationship. Leah Franklin testified that in 1978 she asked petitioner, "Did you murder Susan Nason?" and he replied, "Why do you think things like that of me?" or "You always think things like that of me."

by which memories of traumatic events are repressed and the factors that may contribute to retrieval of the repressed memory. She also testified, over defense objection, that "a particularly hideous, violent act occurring in a childhood filled with repeated acts of both physical and sexual abuse starting at an early age, involving multiple persons, including a parental figure ... would very likely—would probably most likely be repressed." [2]

On cross-examination, Dr. Terr described a number of instances where children had false visual memories about accidents or homicides.

### b. *Dr. Spiegel's Testimony*

Dr. Spiegel, a psychiatrist and Stanford University professor, testified that people who have suffered trauma may block out the memory of the traumatic events. Dr. Spiegel stated that he would expect a person who had repressed the memory of a murder to experience nightmares about the murder and behavioral changes. He also testified that people with repressed memories tend to avoid those things that remind them of the repressed memory.[3]

Dr. Spiegel testified that repressed memories can resurface years later. He testified that retrieval of false memories is also common: people may unconsciously distort their thoughts, memories or ideas when something bad happens and falsely believe that someone they dislike is responsible for the bad event.

### c. *Dr. Loftus' Testimony*

Dr. Elizabeth Loftus, a psychology professor at the University of Washington, testified that there is little if any relationship between the confidence of a person in her recollection of a particular event and the accuracy of that recollection. She noted that repeated retellings of an untrue memory can cause the teller to become increasingly confident that the memory is true. She testified that a person's memory can become "contaminated" by "post-event information." Contamination from post-event information is more likely to occur if a long period of time has passed since the event.

### 3. *The Credibility of Franklin–Lipsker's Testimony*

The credibility of Franklin–Lipsker's testimony about her repressed memory of the events of September 22, 1969 was the primary issue at petitioner's trial. The overriding thrust of the defense was to challenge the credibility of that testimony, including the possibility that Franklin–Lipsker intentionally or unintentionally fabricated her story, or that her memory was a by-product of hypnosis or otherwise an example of "memory contamination."

Petitioner's counsel argued, based on the expert testimony, that Franklin–Lipsker's account of the murder might be a conscious or unconscious fantasy: Franklin–Lipsker knew Nason had been murdered and believed her father was violent and abusive; why should she not then ask herself, "Did Dad do this, too? Did Dad take away my friend?"

Petitioner also raised the possibility that Franklin–Lipsker's husband may have affected Franklin–Lipsker's memory. Barry Lipsker, a "controlling person," had "an intense dislike" for petitioner. The was a "history of animosity" between Barry Lipsker and petitioner. Barry Lipsker was the one who initially encouraged Franklin–Lipsker to come forward with her accusation against her father. In fact, he was the one who first contacted the police about Franklin–Lipsker's memory, without her knowledge. Barry Lipsker kept a file of articles about the Nason murder in the couple's home, and made a videotape of a pretrial "Today" show episode

---

**2.** The hypothetical situation suggested to Dr. Terr by the prosecutor tracked the description Franklin–Lipsker gave of her childhood experience. The prosecution had presented an offer of proof that Dr. Terr would not offer an opinion as to the truth or falsity of Franklin–Lipsker's testimony. The state court of appeal held that the prosecutor's hypothetical question "strayed from the offer of proof," and that Dr. Terr's answer "exceeded the scope of permissible expert testimony." Opinion at 40.

**3.** The defense adduced evidence that after Nason's murder, Franklin–Lipsker took a pleasure trip in petitioner's Volkswagen van, behavior Dr. Spiegel termed "inconsistent" with a person suffering from posttraumatic stress disorder.

in which Franklin–Lipsker was interviewed about the case. Franklin–Lipsker testified that she never looked at any of the articles Barry collected, but that Barry tried to read her articles about the case as many as fifty times. The defense subpoenaed Barry Lipsker, but he declined to return from Switzerland to testify at trial.

The defense also suggested that Franklin–Lipsker may have been motivated to accuse petitioner due to the financial benefit she received from a "book and movie deal" concerning the case which she signed in late June or early July 1990.

The defense further raised the possibility that Franklin–Lipsker's testimony was based on a false memory, triggered while under hypnosis or by some other means. George Franklin Jr., petitioner's son, testified that Franklin–Lipsker had told him in August 1989 that she had remembered their father committing a murder, and that the memory had surfaced under hypnotherapy. In November of 1989, Franklin–Lipsker retracted her statement about hypnotherapy and told George Franklin not to mention hypnosis if called to testify.[4] Franklin–Lipsker admitted that she had made statements about being hypnotized to her brother and mother, but said that she had lied to her brother and mother in making such statements.

The defense also pointed up inconsistencies between Franklin–Lipsker's testimony at trial and her first report of the crime to the police in November 1989. At trial, Franklin–Lipsker testified that she thought she remembered that her sister Janice was in a nearby field when she and her father picked up Nason. Prior to trial, she had told the police and others that her sister Janice was in the van with them, and that her father had told Janice to get out of the vehicle when they picked up Nason. Janice testified at trial, however, that she remembered the day Nason disappeared, but did not recall seeing her sister Eileen, Nason, or her father that day.

Franklin–Lipsker originally told the police in November 1989 that her father drove his van into the woods before stopping to rape and murder Nason. At the trial, she described the assault as occurring at a turnout off Highway 92.

Franklin–Lipsker testified that the changes in her testimony were due to an improvement in her memory over time, whereas the defense claimed that she may have consulted media reports. Franklin–Lipsker denied that she consulted any media reports on the murder, with the exception of a "couple of seconds of" the "Today" show broadcast.

The defense was prevented from offering evidence of contemporaneous press accounts of Nason's murder to show that Franklin–Lipsker's testimony may have been derived from information "in the public domain" rather than personal observations recollected.[5] The defense claimed that "absolutely everything" to which Franklin–Lipsker testified was contained in the newspaper articles. Defense counsel maintained that the newspaper articles were "the heart of the defense." The prosecutor objected that the evidence of 1969 news reports of the murder was irrelevant or inadmissible as unduly misleading and confusing under California Evidence Code Section 352. Agreeing, the court refused to permit the proffered exhibits of newspaper articles to be introduced.

### 4. Evidence of an Alternative Murder Suspect

Finally, the defense presented evidence of an alternative murder suspect. Several residents of the Foster City neighborhood remembered seeing an unfamiliar light-colored blue car in the neighborhood around the time of Nason's disappearance. The police eventually put out a "be-on-the-lookout-flier" for Nason. "At the time we put the bulletin out, there was a description of the car, yes." The reference to the blue car was the result of information provided by children in the neighborhood, particularly one Ann Hobbs,

---

4. In November 1989, a criminal attorney named Jay Jaffe had told Franklin–Lipsker that she would be an "invalid witness" if she had ever been hypnotized.

5. The evidence of the newspaper articles was proffered by petitioner in three forms: "blow-ups," "edited" versions, or reviews and summaries.

who reported that three days before Nason disappeared a man in a blue station wagon tried to lure Hobbs into his car by showing her dolls.

### III. DISCUSSION

Petitioner makes several claims of Constitutional error: (1) that he was deprived of his sixth amendment right to counsel by the prosecution's involvement in his daughter Franklin–Lipsker's post-arraignment questioning of him in jail; (2) that he was deprived of his fifth amendment right to remain silent when the court admitted evidence of that jail conversation and instructed the jury that it could consider petitioner's silence an admission of guilt; and (3) that he was deprived of his right to present a defense and of due process (a) by the trial court's exclusion of relevant, exculpatory evidence establishing that the information contained in Franklin–Lipsker's testimony was available in press reports at the time of the crime; (b) by the introduction of perjured testimony by Franklin–Lipsker; and (c) by the trial court's denial of discovery of material relating to Franklin–Lipsker's drug use and prostitution, which would have enabled petitioner to impeach Franklin–Lipsker. Petitioner claims that the errors require reversal because they had a substantial and injurious effect or influence on the jury's verdict.

### A. *Legal Standard*

■ Federal courts are not forums in which to relitigate state trials. *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3392, 77 L.Ed.2d 1090 (1983). A writ of habeas corpus may issue, however, when a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(3), 2254(a).

■ For purposes of federal habeas review, two broad types of constitutional violations may occur in criminal proceedings. *Hardnett v. Marshall,* 25 F.3d 875, 879 (9th Cir.1994). The first is structural error, affecting the basic elements of a trial. *Id.* This type of error involves "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California,* 386 U.S. 18, 23, 87

S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). Structural error requires automatic reversal of a petitioner's conviction because the entire trial process has been infected. *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993); *see, e.g., Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (right to counsel); *Payne v. Arkansas,* 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975 (1958) (coerced confession); *Tumey v. Ohio,* 273 U.S. 510, 534, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927) (impartial judge).

■ The second is "trial error," violations occurring during the presentation of the case to the jury, which are amenable to harmless-error analysis because they may be qualitatively assessed in the context of other evidence presented in order to determine their effect on the trial. *Brecht,* — U.S. at —, 113 S.Ct. at 1717; *Hardnett,* 25 F.3d at 879. Habeas petitioners may obtain plenary review of claims of trial error of constitutional dimension, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Brecht,* — U.S. at —, 113 S.Ct. at 1722; *Hardnett,* 25 F.3d at 881.

■ Prior to *Brecht,* the standard used to determine whether trial error was harmless was that of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), in which the Supreme Court held that only if the prosecution could prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict was the error harmless and could the verdict stand. In *Brecht,* the Court modified the standard. A federal court on habeas review must now examine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* — U.S. at —, 113 S.Ct. at 1714 (adopting the standard of *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). If the error did not have such an effect, habeas relief is not warranted. Although petitioners face a stricter standard under *Brecht,* the Ninth Circuit has cautioned that "it would be wrong to assume that federal collateral review has lost much of its force." *Jeffries v. Blodgett,* 5 F.3d

1180, 1190 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994). The Supreme Court recently reaffirmed the importance of habeas corpus review in *O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), in which the Court held that a state criminal conviction cannot stand where "record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict." *Id.* at ——, 115 S.Ct. at 994.[6] The Court found this conclusion

> consistent with the basic purpose underlying the writ of habeas corpus. As we have said, we are dealing here with an error of constitutional dimension—the sort that risks an unreliable trial outcome and the consequent conviction of an innocent person ... [The "grave doubt"] rule thereby protects individuals from unconstitutional convictions and helps guarantee the integrity of the criminal process by assuring that trials are fundamentally fair.

*Id.* at ——, 115 S.Ct. at 997.

*Factual Findings*

■ Title 28 U.S.C. § 2254(d) requires a federal habeas court to presume the correctness of state court factual findings. *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); *Patton v. Yount,* 467 U.S. 1025, 1036–37, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984); *Sumner v. Mata,* 449 U.S. 539, 541, 101 S.Ct. 764, 766, 66 L.Ed.2d 722 (1981).[7] The historical factual findings of a state court will not be set aside unless lacking fair support in the record. *McKenzie v. Risley,* 842 F.2d 1525, 1531 (9th Cir.1988) (en banc), *cert. denied,* 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988). When an issue includes a mixed question of law and fact or questions of law alone, the presumption does not apply. *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982); *Dick-*

son v. Sullivan,* 849 F.2d 403 (9th Cir.1988); *Reiger v. Christensen,* 789 F.2d 1425, 1428 (9th Cir.1986).

■ Although the federal court must give deference to the state court's findings of underlying facts, the federal court reserves the right to give different legal weight to such facts. *Evans v. Lewis,* 855 F.2d 631, 633 (9th Cir.1988). Even when the district court accepts a state court's factual findings, it has a duty to render an independent legal conclusion regarding the legality of a petitioner's incarceration. *Miller v. Fenton,* 474 U.S. 104, 115, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985).

**B. *Fifth and Sixth Amendment Violations***

*1. Factual Background*

Petitioner was arrested and given Miranda[8] warnings on November 28, 1989. He was then arraigned and assigned counsel. His counsel informed him not to discuss the case with anyone. Upon arriving at the San Mateo County Jail, he was informed that anything he said to a visitor over the jail telephone could be monitored by jail officials.

At trial, Franklin–Lipsker testified that in January 1990 she went to visit petitioner in jail. In her book *Sins of the Father,*[9] published after the trial, Franklin–Lipsker describes the event in more detail. Franklin–Lipsker says that after her recollection surfaced, she wanted to talk to her father in order to "persuade him to confess, to make him see it was the only thing to do ...." In December of 1989, Franklin–Lipsker discussed this possibility with Deputy District Attorney Martin Murray:

> Two weeks after the arrest, I told Martin Murray about my wish to go see my father—and why. He said that he could not ask me to do that. He was not asking me,

---

6. By "grave doubt," the Court meant "that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.*

7. This rule is not limited to the factual findings of state trial courts. *See Sumner v. Mata,* 449 U.S. 539, 546, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981).

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. Eileen Franklin & William Wright, *Sins of the Father* (1991).

I said, it was entirely my idea. I also assured him that I did not want to do anything that would hurt the case. Marty seemed surprised at my determination, but said that he didn't think it was such a bad idea. He repeated that he could not ask me to do it.

*Sins*, at 164. According to statements made by Murray after the trial, he did discuss the plan with Franklin–Lipsker but told her that she was acting on her own, and does not "recall" whether he told her that the attempt to obtain a confession was a good idea. He has admitted that he provided the name of the official at the jail who could arrange the visit.[10]

After her conversation with Murray, Franklin–Lipsker made arrangements to visit petitioner. Initially she was told to come during regular visiting hours. When she gave the duty officer her name, however, she "was immediately put through to the man in charge, Sergeant Cuneo" who "offered to make the prisoner available at two o'clock on the day [Franklin] requested," a time not available to regular visitors. *Sins*, at 164. The state appellate court found that "Eileen had received at least the blessing of the district attorney's office before speaking with appellant." Opinion at 31 n. 14.[11]

That Franklin–Lipsker had communicated with and received the assistance of the prosecution prior to visiting her father in jail was not known to petitioner at trial because the prosecution did not reveal this information to the defense. The information was discovered only after the trial when Franklin–Lipsker's statements were published in *Sins of the Father*.[12]

At trial, Franklin–Lipsker testified that during the course of her telephone conversation with petitioner in the jail visiting room, Franklin suggested to petitioner that "he should tell the truth." Petitioner's tacit reply was to point to a sign in the visiting room which indicated: "Conversations May Be Monitored."

Franklin–Lipsker testified that petitioner remained silent in the face of her accusation. Petitioner moved to strike the testimony; the motion to strike was denied. The prosecutor made reference to petitioner's silence four times during closing argument. The prosecutor emphasized that petitioner's failure to deny Franklin–Lipsker's accusation constituted an admission of guilt "worth its weight in gold when you put it into the equation of proof beyond a reasonable doubt." The prosecutor claimed that petitioner's response to his daughter amounted to an adoptive admission which "compellingly" proved his guilt. The prosecutor argued that any innocent man would have denied his guilt, but that petitioner failed to do so because he was guilty, and lacked the "chutzpah" to deny it. Rather than giving a curative instruction, the trial court instructed the jury that petition-

---

10. Murray's statements are contained in an article published in the San Francisco Daily Journal. Nina Martin, *"Sins of Father" May Visit Daughter*, S.F. Daily J. (Sept. 18, 1992). The state appellate court apparently accepted the statements by Franklin–Lipsker and Murray as true in formulating its opinion. In any event, the government has not disputed the accuracy of the statements or requested an evidentiary hearing to dispute them. Petitioner is willing to stand on the present record, as he contends that the present record establishes a sixth amendment violation. He submits, however, that an evidentiary hearing, in which Franklin–Lipsker and Murray were subject to cross-examination, could only bolster his claim of government involvement in the incident.

11. This is the Court of Appeal's only reference to the issues underlying the sixth amendment challenge; the court denied the habeas petition in which the sixth amendment claim was raised without comment. Thus, the court did not ex-

plain whether it found no sixth amendment violation, or whether it found such a violation but deemed it harmless error.

12. Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material, either to guilt or punishment." *See also United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that impeachment evidence must be disclosed under *Brady* ). This issue was not raised on appeal and the pretrial discovery record relevant to it is not clear. It is apparent, however, that this failure to disclose information, which would have required consideration by the trial court and possible exclusion of the evidence as the product of efforts of a governmental agent, is a breach of prosecutorial duty. In light of disposition of this case otherwise, the Court will not consider the effect of this breach.

er's silence "in the face of an accusation expressed directly to him ... charging him with the crime ... may be considered against him as indicating an admission that the accusation thus made was true."

### 2. Fifth Amendment Analysis

■ Petitioner claims that the prosecutor's reference to his post-*Miranda* silence as indicative of guilt, and the trial court's instruction that the jury could so construe his silence, violated his fifth amendment right against self-incrimination. The Court agrees.

■ It is a fundamental principle of due process that the government cannot use, at trial, a defendant's post-*Miranda* silence as substantive evidence of guilt. "It does not comport with due process to permit the prosecution during trial to call attention to [the defendant's] silence...." *United States v. Kallin*, 50 F.3d 689 (9th Cir.1995) (quoting *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976)). Silence in the wake of *Miranda* warnings "may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle*, 426 U.S. at 617, 96 S.Ct. at 2244.

■ *Doyle* and the majority of cases interpreting it concern a defendant's post arrest failure to explain his conduct to the police. In this case, the prosecutor referred to petitioner's silence only in regard to petitioner's refusal to counter an accusation from his daughter.[13] California state courts have held that *Doyle* does not apply to a defendant's silence invoked by a private party absent a showing that such conduct was an

assertion of his rights to silence and counsel. *See, e.g., People v. Eshelman*, 225 Cal.App.3d 1513, 1520, 275 Cal.Rptr. 810 (1990). On the other hand, when the evidence demonstrates that the defendant's silence in front of a private party results primarily from the conscious exercise of his constitutional rights, then *Doyle* applies. *Id.; see also People v. Preston*, 9 Cal.3d 308, 313–14, 107 Cal.Rptr. 300, 508 P.2d 300 (1973) ("If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, *and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution*, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.") (emphasis added).

■ The court of appeal held that there could be *Doyle* error even if petitioner's conversation was with a private party, his daughter Franklin–Lipsker, and not the government: "The admissibility of evidence of a defendant's silence does not depend strictly upon who were parties to the conversation." Opinion at 30–31. The State concedes this proposition: the prosecution may not use a defendant's invocation of his right to remain silent subsequent to his receipt of *Miranda* warnings as substantive evidence of guilt, even when the questioner is a private party, if it appears that the defendant is relying on his fifth amendment right to remain silent. Answer at 38.[14]

Respondent argued on appeal that evidence of petitioner's jailhouse conversation

---

**13.** That the Court finds Franklin–Lipsker to be a "government agent" for purposes of sixth amendment analysis, *see infra* Section III.B.4, is not dispositive here. The sixth amendment protects against post-arraignment questioning by a government agent in the absence of counsel, even if the defendant does not realize that the questioner is a government agent. By contrast, the fifth amendment protects against coercion by known government agents. *See Hoffa v. United States*, 385 U.S. 293, 303–04, 87 S.Ct. 408, 414–15, 17 L.Ed.2d 374 (1966). Thus, what is relevant for purposes of fifth amendment analysis is

not the extent of the government's hidden role in Franklin–Lipsker's meeting with petitioner, but that petitioner knew that he was in custody and that his conversations were being monitored by the government.

**14.** Parties have cited no federal cases dealing with the issue of *Doyle* error in the context of post-*Miranda* questioning by private individuals. Neither side disputes the reasoning of the California courts that have addressed the issue, however.

with Franklin–Lipsker was admissible as an adoptive admission with no implication of his right to remain silent. The court of appeal found otherwise. In its opinion, the state court made the following determination:

> In pointing to the sign ["Conversations May Be Monitored"], petitioner was relying on his privilege against self-incrimination. A critical factor here is that when Eileen implored petitioner to admit the murder of Susan, petitioner did not merely remain mute but pointed to the sign indicating that jailhouse conversations might be monitored.

Opinion at 32 (emphasis added). Therefore, the court of appeal found that the trial court had committed *Doyle* error by permitting the introduction of evidence of petitioner's silence.

██ Petitioner argues that the state court's conclusion that petitioner was relying on his privilege against self-incrimination is a factual determination entitled to a presumption of correctness by virtue of 28 U.S.C. § 2254(d). "A finding as to a person's motivation in taking a particular action at a particular time plainly concerns an issue of historical fact which, because it was resolved by the state Court of Appeal, must be adopted by this Court." Pet.'s Traverse, at 4; *cf. Cabana v. Bullock*, 474 U.S. 376, 388 n. 5, 389, 106 S.Ct. 689, 698 n. 5, 698–99, 88 L.Ed.2d 704 (1986) (stating that factual findings of intent going to culpability could be decided by a state appellate court where no state or federal law specified who must make the findings, and that presumption of correctness would apply if the factfinding was "adequate"). As California courts have framed the issue, the question whether a defendant intended to invoke his fifth amendment right to remain silent appears to be a factual question entitled to a presumption of correctness. As such, the Court accepts the state court's finding that, by pointing to the sign, Franklin intended to invoke his right to remain silent.

Even if it is a question of law or mixed question of fact and law subject to *de novo* review, *cf. Miller v. Fenton*, 474 U.S. at 116, 106 S.Ct. at 452–53 (holding that the voluntariness of a confession is not a factual issue entitled to a presumption of correctness under 28 U.S.C. § 2254(d), but is a legal question meriting independent consideration in a federal habeas corpus proceeding), this Court finds that petitioner invoked his fifth amendment right to remain silent. Petitioner chose to remain silent, knowing that he was in custody and that the government was listening to his calls. In declining to answer his daughter's question, Franklin explicitly pointed to the sign saying that the government monitored conversations. His pointing to the sign indicates that the desire *not* to talk to the government was his motivating factor in remaining silent. If this is not an invocation of the right to remain silent, it is difficult for the Court to imagine what would be. Surely petitioner need not state, "I am not answering your question, Eileen, because I am invoking my fifth amendment right against self-incrimination" in order not to have his silence used against him. The compelling inference to be drawn from Franklin's conduct is that he was relying on the right to silence guaranteed by the fifth amendment. *People v. Preston*, 9 Cal.3d 308, 313–14, 107 Cal.Rptr. 300, 508 P.2d 300 (1973).

██ Even if petitioner had not pointed at the sign, the Court believes that the circumstances are such that it would have been improper for the government to use petitioner's silence against him at trial. *Doyle* explains that the state may not use a defendant's post-*Miranda* silence against him at trial because silence in the wake of *Miranda* warnings is "insolubly ambiguous" and "may be nothing more than the arrestee's exercise of these *Miranda* rights." *Doyle*, 426 U.S. at 617, 96 S.Ct. at 2244. *Doyle* does not place a burden on the defendant to prove that he was exercising his *Miranda* rights in remaining silent. Because post-*Miranda* silence is "insolubly ambiguous," such silence may not be used against the defendant at trial. When a defendant is in the presence of the government, he has the right to remain silent in the face of questioning, whether the questioning is from a private individual or the police. Although the government was not visibly present when Franklin–Lipsker questioned Franklin, the government was audibly present. Franklin knew that the gov-

ernment could be monitoring his conversation. Therefore, his silence may not be used against him at trial.

For these reasons, the Court concludes that the trial court violated petitioner's privilege against self-incrimination by allowing the state to present evidence of petitioner's failure to respond to Franklin–Lipsker's accusation and then to argue that his silence was indicative of guilt.

### 3. Harmless Error

■ The court of appeal agreed that *Doyle* error had occurred. Opinion at 32. The court of appeal continued:

> We are fully aware that much more than mere passing reference was made to appellant's silence. The prosecution presented the evidence of appellant's failure to respond to Eileen's accusation, then emphasized it in closing argument. An instruction was also given to the jury to consider an adoptive admission, if found, as indicative of the truth of the accusation, thus compounding the impact of the improper use of appellant's silence.

In spite of this, the court of appeal deemed the error harmless. Opinion at 33. Engaging in a *de novo* analysis of prejudice following a full review of the record, *Dickson v. Sullivan*, 849 F.2d 403 (9th Cir.1988), this Court emphatically disagrees that the *Doyle* violation constituted harmless error. *Doyle* error is "trial error" subject to harmless error review under *Brecht*, —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993). *Brecht* requires that a conviction be overturned when the trial error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). This is just such an error. It is difficult to imagine a more egregious *Doyle* error or one that so infected the entire conduct of a trial. In the context of a substantial challenge to the credibility of Franklin–Lipsker as already de-

scribed, the prosecution told the jury repeatedly that petitioner had remained silent in the face of an accusation of guilt. In closing argument, the prosecutor argued that Franklin's invocation of his right to remain silent "compellingly" proved his guilt and was "worth its weight in gold when you put it into the equation of proof beyond a reasonable doubt." The trial court, after erroneously admitting the evidence, rather than giving a curative instruction as it should have, told the jury they could consider petitioner's silence as evidence of his guilt.

In *United States v. Kallin*, 50 F.3d 689 (9th Cir.1995), the Ninth Circuit recently addressed a similar situation involving the prosecution's improper comment on a defendant's right to remain silent. Kallin was convicted of attempted tax evasion and subscribing to a false tax return. "During cross-examination of Kallin and during its closing argument, the government repeatedly commented on his failure to come forward" with an explanation in the face of evidence against him and on the fact that he hired a lawyer. *Id.* at 692. The trial court instructed the jury to disregard the testimony. On appeal, the government admitted that it had violated Kallin's rights at trial. The government argued, however, that the error was harmless. The court of appeals rejected this argument. The court held that the comment, even in the context of a curative instruction being given, was in itself prejudicial enough to require reversal.[15]

First, the court noted that the prosecutor's impermissible references to *Kallin*'s silence were not inadvertent but were "calculated so that an inappropriate 'inference of guilt from silence was stressed to the jury....' " *Id.* at 693 (quoting *United States v. Foster*, 985 F.2d 466, 468 (9th Cir.1993)). Moreover, the impermissible implication was emphasized during the prosecutor's closing argument. *Id.* The instant case is similar, but even more prejudicial. The prosecutor's imper-

---

**15.** Because in *Kallin,* the *Doyle* error was raised on direct appeal, the government had to demonstrate that the error was harmless beyond a reasonable doubt. *Kallin,* 50 F.3d at 693. Because the *Doyle* error is before this case on collateral review, the question is whether the error had a

substantial or injurious effect on the verdict. *Brecht,* —— U.S. at ——, 113 S.Ct. at 1714. *Kallin* nonetheless is of relevance to this case, as it discusses the nature and degree of prejudice created by the prosecution's unconstitutional use of a defendant's right to remain silent.

missible references to petitioner's silence were not inadvertent but were calculated to make the jury believe that the silence "compellingly" proved petitioner's guilt. *Kallin,* 50 F.3d at 694; *see also United States v. Baker,* 999 F.2d 412, 416 (9th Cir.1993) (directing the reviewing court to consider "whether an inference of guilt from silence was stressed to the jury"). Moreover, the impermissible references to petitioner's silence were emphasized during closing argument. *Kallin,* 50 F.3d at 694; *see also United States v. Kojayan,* 8 F.3d 1315, 1318 (9th Cir.1993) (in assessing prejudice, courts must remember that "closing argument matters; statements from the prosecutor matter a great deal"). Four such comments were made during closing argument, including the comment that Franklin's silence was "worth its weight in gold when you put it into the equation of proof beyond a reasonable doubt." *Cf. Baker,* 999 F.2d at 415–16 (finding two references to defendant's silence in closing rebuttal argument "extensive and prejudicial"); *United States v. Newman,* 943 F.2d 1155 (9th Cir.1991) (finding three references to defendant's silence "extensive and prejudicial").[16]

In *Kallin,* the government suggested that the trial court's instruction directing the jury to disregard the impermissible questioning and testimony cured the due process error. The court disagreed, noting that the charge to the jury was not contemporaneous with the error and itself "reiterated the impermissible content of the testimony." *Kallin,* 50 F.3d at 694. At petitioner's trial, the trial court's instruction was all the more damaging. Instead of providing a curative instruction, the trial court explicitly instructed the jury that they could consider petitioner's si-

lence as evidence of his guilt. The Court is aware of no case where the trial court explicitly instructed the jury that they could consider petitioner's silence as evidence of his guilt in which the constitutional violation was found to be harmless error.

Finally, the government argues that regardless of the *Doyle* violation, petitioner would have been convicted—the case against him was simply overwhelming. The Ninth Circuit rejected this argument in *Kallin* and *Jeffries v. Blodgett,* 5 F.3d 1180, 1190 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994). In *Jeffries,* the Court reversed on habeas corpus a state conviction marred by prosecutorial comment on the defendant's fifth amendment right to remain silent:

> The inquiry cannot be merely whether there was enough to support the result apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Jeffries,* 5 F.3d at 1190. As Justice Stevens' concurring opinion in *Brecht* explains:

> [W]e would misread *Kotteakos* itself if we endorsed only a single-minded focus on how the error may (or may not) have affected the jury's verdict. The habeas court cannot ask only whether it thinks the Petitioner would have been convicted even if the constitutional error had not taken place. *Kotteakos* is full of warnings to avoid that result. It requires a reviewing court to decide that "the error did not influence the jury" ... and that "the judgment was not substantially swayed by the error."

---

16. The prosecution itself demonstrated the importance of testimony that Franklin remained silent, as evidenced by its argument that his silence "compellingly" proved his guilt and its description of his silence as "worth its weight in gold."

Respondent suggests that because other testimony which the jury might have considered an admission of guilt was introduced, introduction of the confession-by-silence to his daughter was merely cumulative and therefore harmless. *See Brecht,* —— U.S. at ——, 113 S.Ct. at 1722. Petitioner's statement to the police after his arrest: "Have you talked to my daughter?" is susceptible

to more than one interpretation and can be interpreted as an acknowledgement of the identity of petitioner's accuser rather than an admission of guilt. And *petitioner's statement to his wife after she asked him whether he had murdered Nason:* "Why do you think things like· that of me?" or "You always think things like that of me" can be interpreted as a denial of culpability. In any event, it was neither of these statements, but rather petitioner's invocation of his fifth amendment right when confronted by his daughter, that was described by the prosecutor as "worth its weight in gold" and "compellingly" proving petitioner's guilt.

**1450**

*Brecht,* — U.S. at ——, 113 S.Ct. at 1724 (Stevens, J., concurring).

The court of appeal found Franklin–Lipsker's testimony "compelling" and "corroborated" and therefore found the error harmless. First, even indulging the assumption that Franklin–Lipsker's testimony was compelling and corroborated, this is not sufficient to find the error harmless. In *Kallin,* the court found that because the *Doyle* error affected the "crucial issue of credibility," the strong evidence against Kallin could not insulate the verdict. 50 F.3d at 695. At petitioner's trial, as in *Kallin,* the *Doyle* error affected the crucial issue of credibility. The jury was confronted with a single eyewitness who claimed a recovered memory of an incident seen decades earlier. Whether or not the court considers "new" evidence casting doubt on the reliability of repressed memory testimony,[17] it is clear that the impact of the erroneous introduction of contemporary evidence offered to bolster this single witness's testimony must have been substantial. The Court is aware of no case, state or federal, that has held the unconstitutional introduction of an admission of guilt to be harmless error in a case in which the state depends for a conviction on a single eyewitness.

Furthermore, the Court questions whether the evidence against petitioner was overwhelming. As discussed in Section II.B.3 *supra,* there were numerous contradictions in the pretrial and trial testimony of Franklin–Lipsker, the state's sole eyewitness. Franklin–Lipsker also admitted that she had lied about her memory surfacing during hypnosis. As discussed in Section III.C *infra,* the corroborative details of Franklin–Lipsker's account of the murder were available in the public domain. And, there was no corroborating physical evidence tying Franklin to the twenty-year-old crime.

Accordingly, the Court finds that the violation of petitioner's fifth amendment rights had a substantial and injurious effect on the jury's deliberations. As such, the conviction cannot stand.

### 4. *Sixth Amendment Analysis*

■ Petitioner claims that introduction of testimony regarding his post-*Miranda* silence constituted not only a fifth amendment violation but also a sixth amendment violation, because the testimony was the fruit of the government's improper involvement in his daughter's post-arraignment questioning of him outside the presence of counsel. Although it is a closer question, the Court agrees that petitioner's sixth amendment rights were violated.

■ The sixth amendment guarantees a criminal defendant the right to an attorney. The Supreme Court in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), held this right applicable to post-indictment questioning. The *Massiah* Court reversed the conviction of a defendant

> when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.

377 U.S. at 206, 84 S.Ct. at 1203; *see also Kuhlmann v. Wilson,* 477 U.S. 436, 460, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986). The *Massiah* right is even "more seriously imposed upon" when, like petitioner, the accused is in custody and does "not know that his [questioner is] a government agent." *United States v. Henry,* 447 U.S. 264, 273, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980); *Massiah,* 377 U.S. at 206, 84 S.Ct. at 1203.

---

**17.** Petitioner presents evidence that repressed memory testimony has been widely discredited since its use at petitioner's trial. The state complains that this material was not before the jury, and could not have affected its verdict. Petitioner agrees. He explains that consideration of the material is appropriate, however, "given the startling nature of the state appellate court's conclusion that the evidence of Franklin's guilt was 'overwhelming.'" Petitioner says that he is simply attempting to demonstrate that the court of appeal's implicit faith in Eileen's "repressed" account was misplaced, not to offer new evidence of innocence.

This being the case, the Court does not find such evidence directly relevant to its decision. This Court reviews the court of appeal's result, not its reasoning. Therefore, the Court should look to the effect of trial error on the jury *at the time of the trial,* regardless of whether the court of appeal properly or improperly placed its faith in repressed memory testimony.

[T]he mere fact of custody imposes pressures on the accused; confinement may bring in to play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents. *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 2188–89, 65 L.Ed.2d 115 (1980).

▪ An accused is protected from questioning by a government agent who, when the government intentionally creates a situation likely to induce the accused to make incriminating statements without the assistance of counsel, attempts to so elicit such statements. *United States v. Henry,* 447 U.S. 264, 270–74, 100 S.Ct. 2183, 2186–89, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In *Henry,* the Court held that an informant's statements were inadmissible as a violation of the defendant's right to counsel, because the informant, as a government agent, "deliberately elicited" incriminating statements from the defendant. *Henry,* 447 U.S. at 270, 100 S.Ct. at 2186–87.

▪ If the government directs an individual to elicit incriminating statements from a defendant, the sixth amendment is violated. If, by contrast, the state obtains incriminating statements "by luck or happenstance," *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985), the sixth amendment is not violated. Thus, if Franklin–Lipsker had gone to speak to her father on her own and only afterwards told the state about it, there would be no violation of petitioner's *Massiah* rights. If, by contrast, the state had approached Franklin–Lipsker and asked her to obtain a confession, there would be a violation. The actual facts of the case fall somewhere in between. In the Court's judgment, though, the government's involvement in Franklin–Lipsker's visit to her father was sufficiently extensive as to constitute a *Massiah* violation.

The state was inextricably intertwined in Eileen Franklin–Lipsker's visit to her father. The district attorney told Franklin–Lipsker that her plan to obtain a confession from her father was "not a bad idea," gave her the phone number of the jail official to contact, and met with her just prior to the visit. When the jail official realized who she was, he made special arrangements for her to visit her father during nonvisiting hours. As the state appellate court found, "Eileen had received at least the blessing of the district attorney's office before speaking with appellant."[18]

This scenario is not comparable to a government that simply receives "by luck or happenstance" a confession from a suspect. *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985). Although the government did not order Franklin–Lipsker to meet with her father, the government approved of her decision, thus lending her moral support. The government also lent her practical support by arranging a special visit to her father during nonregular visiting hours. It is improper for the government to so involve itself in the questioning of a person in custody by a private citizen. *Cf. United States v. Surridge,* 687 F.2d 250 (8th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982) ("As long as police do nothing to direct or control or *involve themselves* in the questioning of a person in custody by a private citizen, such questioning does not violate the fifth or sixth amendments.") (emphasis added). The government should not reap the benefits of such conduct.

*Henry* directs the federal court to consider whether the government "intentionally creat[ed] a situation likely to induce [the accused] to make incriminating statements without the assistance of counsel." *Henry,* 447 U.S. at 274, 100 S.Ct. at 2189. The government and Franklin–Lipsker together "creat[ed] a situation likely to induce" peti-

18. Petitioner claims that this finding by the appellate court is a question of fact entitled to a presumption of correctness under Section 2254. That Mr. Murray "blessed" Eileen's visit is more in the nature of a characterization of underlying facts than a historical fact itself. Whether the state court's finding that Mr. Murray "blessed" Franklin–Lipsker's visit is considered a question of fact, a question of law, or a mixed question of fact and law is immaterial, however, as this Court agrees under any standard that Mr. Murray "blessed" Franklin–Lipsker's visit. This does not complete the analysis, however. The Court must analyze the legal significance of this finding.

tioner to make incriminating statements without the assistance of counsel. At the very least, the state knowingly exploited an opportunity to question petitioner outside the presence of counsel. *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985) ("[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity."). Accordingly, the sixth amendment was violated.

### 5. *Harmless Error Review*

■ Petitioner suggests that *Massiah* error should be evaluated under the *Chapman* standard (harmless beyond a reasonable doubt), rather than the *Kotteakos* standard articulated in *Brecht v. Abrahamson,* —— U.S. at ——, 113 S.Ct. at 1714 (whether "trial error" had a substantial and injurious effect or influence in determining the jury's verdict.) The court disagrees. *Brecht* makes no distinction between types of harmless error. Rather, *Brecht* holds that automatic reversal is required for "structural error" and that *Kotteakos* harmless-error review applies to "trial error." The erroneous admission at trial of evidence of petitioner's silence to his daughter, obtained in violation of the sixth amendment, is error which "occurs during the presentation of the case to the jury." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1717. As such, it is "trial error" subject to harmless error review under the *Kotteakos* standard. *See also Moore v. Illinois,* 434 U.S. 220, 232, 98 S.Ct. 458, 466–67, 54 L.Ed.2d 424 (1977) (admission of identification testimony obtained in violation of right to counsel subject to harmless-error review); *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (confession obtained in violation of right to counsel subject to harmless error review).

■ Normally, *Massiah* issues raise the troubling trade-off between the need to condemn improper state investigative methods and the desire to let the truth be heard. That is, the evidence sought to be suppressed by a *Massiah* motion is normally a credible admission of guilt by the defendant. Here, the state's involvement in petitioner's questioning by his daughter in the absence of counsel did *not* obtain an admission of guilt from petitioner. Rather, the state obtained nothing more than an exercise of Franklin's constitutional right to remain silent, a right the state had told petitioner he could exercise without penalty. Yet the state introduced evidence of this silence at trial. This constituted both *Doyle* error and *Massiah* error. As the fruit of the *Massiah* violation was the introduction at trial of evidence of petitioner's silence, the prejudice resulting from this violation is identical to the prejudice resulting from the fifth amendment violation. *See supra* Section III.B.3.

### C. *Deprivation of Due Process and Right to Present a Defense*

Finally, petitioner claims that he was deprived of his right to present a defense and of due process by the trial court's (a) exclusion of relevant, exculpatory evidence establishing that the information contained in Franklin–Lipsker's testimony was available in press reports at the time of the crime; (b) by the introduction of perjured testimony by Franklin–Lipsker; and (c) by the court's denial of discovery of material relating to Franklin–Lipsker's drug use and prostitution, which would have enabled petitioner to impeach Franklin–Lipsker.

### 1. *Exclusion of "Public Domain" Evidence*

#### a. *Factual Background*

Petitioner indicated at the outset of the trial that he intended to introduce contemporaneous newspaper accounts of the Nason murder to contradict the prosecution's argument that Franklin–Lipsker could only have known what she did about the Nason murder if she had observed the crime. Defense counsel promised the jurors in opening statement that they would "see that everything Eileen Lipsker claims to know about this case, everything ... was in the public domain. Everything she tells you was known to the community. Television, newspapers, everything."

Accordingly, on November 26, 1990, petitioner offered into evidence Defense Exhibit KKK, consisting of a compilation of newspaper articles about the Nason murder and/or information contained in those articles. Counsel contended that the evidence concerning the availability of the details as to Nason's murder testified to by Franklin–Lipsker was "the heart of the defense." The prosecutor opposed the admission, conceding that counsel could argue that Franklin–Lipsker could have learned the information from external sources, but objecting that the evidence of news reports of the murder was irrelevant or inadmissible as unduly misleading and confusing under California Evidence Code Section 352. The trial court sustained the prosecutor's objection. The defense subsequently requested permission to present a "streamlined" version of the "public domain" evidence, "limited to San Mateo coverage." The court again sustained the prosecutor's objection to the evidence as "not proper . . . . [T]his is covered in the testimony and this is not going to be a battle of the newspapers, what the newspaper have reported in this case. [¶] I am just not going to do it."

After succeeding in excluding the "public domain" evidence, the prosecutor argued in closing argument that the crime-scene details provided could only have come from an eyewitness. The prosecutor emphasized how Franklin–Lipsker talked about the smashed silver ring, a "minute" detail. The prosecutor queried, "How could she have known" that petitioner threw the shoes down there? In closing argument, the prosecutor asked, "How could she have known that there was a rock laying beside the body?"

The defense was effectively denied the opportunity to rebut this line of argument. The defense was not permitted to introduce evidence that the facts testified to by Franklin–Lipsker were available in press accounts of the murder. The defense was not permitted to introduce evidence that the fact that Nason's body had a crushed silver ring on its right middle finder appeared in a number of articles about the case printed in the Peninsula Times Tribune, the San Jose Mercury News, the San Francisco Examiner, and the San Mateo Times in December 1969 to explain how Franklin–Lipsker "could have known" about the crushed silver ring. The defense was not permitted to introduce evidence that references to a brown shoe or shoes appeared in a number of articles about the case printed in the Peninsula Times Tribune, the San Francisco Examiner, and the San Francisco Chronicle in late 1969 to explain how Franklin–Lipsker could have known about the shoes. The defense was not permitted to introduce the San Francisco Examiner of December 7, 1969, which mentioned that "[a] bloodstained rock—apparently the murder weapon—was found near the body" to explain how Franklin–Lipsker "could . . . have known that there was a rock lying near the body."

### b. *Analysis*

The erroneous exclusion of a defendant's evidence may violate the defendant's sixth amendment and due process rights. *See Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The Sixth Amendment requires "at a minimum, that criminal defendants have . . . the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 1000, 94 L.Ed.2d 40 (1987). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). The authority granted the trial court under Evidence Code § 352 to exclude evidence that is unduly prejudicial, cumulative, confusing, or misleading, must yield to a defendant's constitutional right "to present all relevant evidence of significant probative value to the defense." *People v. Babbitt,* 45 Cal.3d 660, 684, 248 Cal.Rptr. 69, 755 P.2d 253 (1988) (citing *Washington v. Texas,* 388 U.S. at 23, 87 S.Ct. at 1925 and *Chambers v. Mississippi,* 410 U.S. at 302, 93 S.Ct. at 1049). Federal habeas corpus review does not generally lie to review asserted errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1990). Habeas corpus relief is available, however, where an evidentiary ruling results in the denial of fundamental fairness and therefore a violation of due process.

 The constitutional right to present relevant evidence that disproves a key prosecutorial contention is well illustrated by *United States v. Begay,* 937 F.2d 515 (10th Cir.1991). In *Begay,* the defendant was charged with having sexual relations with a minor. The government offered as proof of the occurrence of the charged act medical testimony that the child had an enlarged hymen. The child, however, had concededly been the subject of sexual abuse by another person on a prior occasion. The defense sought to offer the fact of the prior abuse to disprove the contention that the physical condition of the child could only be attributable to Begay's commission of the offense. The trial court excluded the evidence as unduly prejudicial. The Tenth Circuit reversed, finding the excluded evidenced tended "to counter the damaging evidence of the child's physical condition, which the prosecution was obviously relying on to point to the defendant's guilt." The court held that "the evidence should have been admitted as constitutionally required to protect Begay's rights under the Confrontation Clause." *Begay,* 937 F.2d at 523.

Similarly, petitioner Franklin was prevented from introducing evidence to disprove the contention that Eileen Franklin–Lipsker's memory of minute details of the crime scene could only be attributable to petitioner's commission of the offense. The newspaper articles disprove the contention that Franklin–Lipsker *must* have witnessed the murder, as there was no other way she could have known the details of the crime. As petitioner's counsel posed the issue at oral argument:

> It occurred to me this morning that were I to be arrested and charged in Oakland with committing an offense yesterday, and were my alibi to that to be, I was not in Oakland yesterday, I could not have committed the crime, I was standing in front of the White House, and I can prove that I was standing in front of the White House because I can describe an extraordinary event that happened there, I can tell you that the police shot a man, I can tell you what he was wearing, I can tell you that there was a knife taped to his wrist ... and there's no way that I would know all of those facts which are true were I not at the White House. I submit to you that the proposition that the prosecution in that situation could not admit the Chronicle this morning which contains the picture and contains every detail I'm talking about [is ludicrous].... That fact would come in like a hot knife through butter....

Respondent argues that Exhibit KKK was not admissible because petitioner did not lay a proper foundation by proving that Franklin–Lipsker had actually read any of the newspaper articles. Such a "foundation" is not required. In the above hypothetical, the government would not be required to first prove that the defendant had read the Chronicle article about the White House shooting in order to introduce the article. Exhibit KKK was being proffered to disprove the prosecution's contention that Franklin–Lipsker's repressed memory must have been correct, because there was no other way Franklin–Lipsker could have known the details of the crime. As such, it was directly and critically relevant to the defense. Consequently, "the evidence should have been admitted as constitutionally required to protect [petitioner's] rights under the Confrontation Clause." *Begay,* 937 F.2d at 523.[19]

### c. *Harmless Error*

 Petitioner suggests that the erroneous exclusion of this evidence is not subject to harmless error review but is subject to automatic reversal because it is a "structural error." The Court disagrees. Just as the erroneous introduction of evidence is a "trial error" subject to harmless error review,

---

**19.** In addition to asserting that the evidence was excluded in violation of the Constitution, petitioner contends that the prosecutor committed misconduct "by arguing to the jury a proposition she knew to be false," that is, by implying that the details of the crime were not available in the public domain. The prosecutor queried, "How could Franklin–Lipsker have known" such minute details of the murder, unless she was there? This is clearly a problematic reference. The jury may have been misled into falsely thinking that the details of the crime scene were not available in the public domain.

*Henry v. Estelle,* 993 F.2d 1423, 1428 (9th Cir.1993), the erroneous exclusion of evidence is a trial error subject to harmless error review. *See United States ex rel. Ashford v. Director, Ill. Dep't of Corrections,* 871 F.2d 680, 688 (7th Cir.1989) (applying harmless error analysis to constitutional error arising from exclusion of evidence defendant sought to admit).

■ Under *Brecht,* the error requires reversal only if it had a substantial and injurious effect on the jury's verdict. The credibility of any eyewitness is at issue. The credibility of this single eyewitness, who came forward twenty years after the crime was committed and who claimed to have repressed the memory of the murder for twenty years, was *the* critical issue at this trial. If the prosecution could prove that there were verifiable details of Franklin–Lipsker's account of the crime that were not in the press accounts, that no one else in the public knew about, this would lend great weight to Franklin–Lipsker's testimony. In the words of the prosecution, How could Franklin–Lipsker have known the minute details of the crime unless she witnessed it being committed? This image that the jury was left with understandably permits the jury to conclude that Franklin–Lipsker must have witnessed the crime. In fact, however, the verifiable details of the crime testified to by Franklin–Lipsker were available in the public domain. Thus, there *was* a way Franklin–Lipsker could have known about the details of the crime without being at the crime scene—by reading the newspaper, watching television, or speaking with people who had received information about the murder.

It is likely that this error had a critical effect on the jury inasmuch as it served to make the testimony of the key prosecution witness seem irrefutable, when in fact there was an alternative explanation for Franklin–Lipsker's testimony *other* than that she witnessed the murder. At the very least, this Court is left in grave doubt as to the fairness of the conviction based on the erroneous exclusion of this evidence. Certainly, in combination with the fifth and sixth amendment violations, there was cumulative error sufficient to require reversal under *Brecht. See*

*Kwan Fai Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir.1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death.") (citing *United States v. Tucker,* 716 F.2d 576, 595 (9th Cir.1983) ("a court may find unfairness—and thus prejudice—from the totality of counsel's errors and omissions")); *Ewing v. Williams,* 596 F.2d 391, 395 (9th Cir.1979) ("prejudice may result from the cumulative impact of multiple deficiencies").

### 2. *Other Alleged Errors*

The *Doyle* violation, the *Massiah* violation, and the due process violation of exclusion of "public domain" evidence are so substantial and injurious as to require reversal of petitioner's conviction under *Brecht.* Petitioner makes two other claims of error. Because the Court finds the previous three errors sufficient to mandate reversal, it need not reach the merits of petitioner's remaining contentions. However, the Court will briefly address these issues.

#### a. *Allegations of Perjury*

Petitioner alleges that Franklin–Lipsker committed perjury regarding her familiarity with press and television coverage of the Nason murder. Petitioner has submitted a declaration by Franklin–Lipsker's sister Diana Franklin that contradicts certain aspects of Franklin–Lipsker's testimony. Franklin–Lipsker testified that she saw only a "couple of seconds" of the "Today" show episode, whereas Diana says that she saw her sister watch "most" of it. Diana further says that Franklin–Lipsker instructed her to say that she had left the room during the "Today" show report, if asked about her having seen the report, whereas in fact she was in the room for much of the report. Franklin–Lipsker testified that she never looked at news reports of the Nason killing, whereas Diana says that she saw Franklin–Lipsker review newspapers containing such reports close to the time of her testimony against petitioner.

In *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), the Supreme Court held that the prosecution's knowing use of false testimony violated the due process clause. There is no evidence that the state knowingly introduced false testimony by Franklin–Lipsker. The Ninth Circuit has recently said, however, that even an unwitting use of perjured testimony may deprive a defendant of a fair trial:

> a government's assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence. A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness. Thus, even if the government unwittingly presents false evidence, a defendant is entitled to a new trial "if there is a reasonable probability that [without the evidence] the result of the proceedings would have been different."

*United States v. Young*, 17 F.3d 1201, 1203–04 (9th Cir.1994) (internal quotation omitted). Evidence that Franklin–Lipsker asked her sister to inaccurately describe her whereabouts during the "Today" show broadcast and that Franklin–Lipsker saw newspaper accounts of the murder could serve to significantly undercut her credibility. In order to fully explore the question of what Franklin–Lipsker knew of the press accounts, and when she knew it, an evidentiary hearing would be necessary. As the matter can be otherwise resolved in favor of petitioner, the Court need not, and does not, decide the perjury claim.

### b. *Failure to Turn over Discovery of Materials Related to Franklin– Lipsker's Credibility*

In additional to the constitutional violations described above, petitioner argues that his conviction must be vacated because the trial court precluded revelation of other evidence which would impeach Franklin–Lipsker's credibility. Specifically, the trial court permitted the prosecution to withhold pretrial disclosure regarding Franklin–Lipsker's arrest for prostitution and drug possession and of her 1989 effort to expunge the misdemeanor conviction that resulted from her prostitution arrest.[20] Arguably, this information could significantly undercut Franklin–Lipsker's credibility. Franklin–Lipsker's history of drug use may have had an impact on her memory and her alleged recovery of a repressed memory. That she sought to have her prostitution conviction expunged around the same time she contacted the police could suggest that she was making an effort to minimize exposure to attacks on her character, and thus serve to undercut her depiction as an extraordinarily reluctant witness who only came forward through the acts of others. Although the Court does not decide the question of whether constitutional error occurred, the lack of discovery was clearly problematic.

### IV. CONCLUSION

Accordingly, this Court finds that violations of the Constitution in this trial had a substantial and injurious effect on the jury's verdict, that the risk of an unreliable outcome in this trial is unacceptable, and that this verdict was the product of a trial which was not fundamentally fair.

For all the foregoing reasons, George Thomas Franklin's petition for writ of habeas corpus is GRANTED and petitioner's conviction in San Mateo County Superior Court action C–24395 is vacated. The State of California shall have ninety (90) days in which to initiate new trial proceedings against petitioner in this matter.

IT IS SO ORDERED.

---

**20.** The trial court did permit the prosecution to introduce as part of its case in chief extensive testimony from members of the Franklin family about acts of physical and emotional abuse petitioner allegedly inflicted on his wife and children.