George Thomas FRANKLIN, Plaintiff–Appellant,

v.

Jim FOX; Martin Murray; Robert Morse; Bryan Cassandro; John Cuneo, Sergeant; Eileen Franklin–Lipsker, Defendants–Appellees.

No. 01–15052.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2001.

Filed Nov. 27, 2002.

Dennis P. Riordan, Riordan and Rosenthal, San Francisco, CA; Andrew C. Schwartz, Casper, Meadows, and Schwartz, Walnut Creek, CA, for the plaintiff-appellant.

James M. Wagstaffe and Pamela Urueta, Kerr and Wagstaffe LLP, San Francisco, CA, for defendants-appellees Martin Murray, Robert Morse, Bryan Cassandro, and John Cuneo.

Richard S. Diestel, Bledsoe, Catheart, Diestel, Livingston and Pedersen, San Francisco, CA, for defendant-appellee Eileen Franklin–Lipsker.

Before: B. FLETCHER, BOOCHEVER and FISHER, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

In 1989, Defendant Eileen Franklin–Lipsker ("Franklin–Lipsker") informed the police that she had been an eyewitness to the 1969 sexual molestation and murder of her eight-year-old best friend, Susan Nason. She implicated her father, Plaintiff George Franklin ("Franklin"), in the twenty-year-old unsolved case; a San Mateo County, California jury convicted him of first degree murder. Franklin served five years of a life sentence before a federal district court granted him a writ of habeas corpus due to unconstitutional errors in his state court trial. *Franklin v. Duncan,* 884 F.Supp. 1435 (N.D.Cal.1995). We affirmed. *Franklin v. Duncan,* 70 F.3d 75 (9th Cir.1995) (per curiam) (adopting the district court opinion and supplementing the factual record).

On the heels of his release, Franklin sued in federal district court, alleging claims arising under 42 U.S.C. § 1983 and state law. *See Franklin v. Fox,* 107 F.Supp.2d 1154 (N.D.Cal.2000). He appeals the district court's final order of summary judgment in favor of defendants with respect to two claims: (1) Franklin alleges that Franklin–Lipsker conspired with detectives Robert Morse ("Morse") and Bryan Cassandro ("Cassandro") to arrest him without probable cause in vio-

lation of his Fourth and Fourteenth Amendment rights by, among other things, relying on Franklin–Lipsker's hypnotically-induced memories; (2) he further claims that Franklin–Lipsker conspired with Assistant District Attorney Martin Murray ("Murray") and jail official John Cuneo ("Cuneo") to violate his Sixth Amendment rights by using Franklin–Lipsker as an agent of the government to attempt to elicit a confession outside the presence of Franklin's counsel.

▆ The district court entered summary judgment for the defendants on these claims[1] pursuant to Federal Rule of Civil Procedure 54(b).[2] *See James v. Price Stern Sloan, Inc.,* 283 F.3d 1064, 1068 n. 6 (9th Cir.2002). We have subject matter jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court with respect to all claims and all defendants.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1969: Susan Nason's Murder

Eight-year-old Susan Nason ("Susan") disappeared after school on September 22, 1969. Just over two months later, a San Francisco Water Department employee found the girl's broken, decomposed remains in a ravine off Highway 92, a route not far from Susan's home that leads to Half Moon Bay on the Pacific coast. She had been bludgeoned. Police did not find her killer.

### 1989: Eileen Franklin–Lipsker Implicates Her Father

On November 17, 1989, a caller identifying himself only as "Barry" told the police that his wife had witnessed a murder at the hands of someone she knew well when she was just eight years old.[3] Barry—in reality Barry Lipsker, Franklin–Lipsker's then-husband—expressed his wife's extreme reluctance to come forward with her information because the murderer had threatened her before and because she feared that, even were he convicted, he would only serve a short sentence. The inspector who took the call explained repeatedly that he could not make any concrete representations about what form an investigation or trial would take without understanding the case and all its evidence. In a second call on the same day, Barry's wife joined the two men on the phone. The inspector informed her about what her role might be as a witness and what she might expect if she decided to report the crime.

During a third call three days later, Barry relayed his wife's continuing hesi-

---

1. The district court did not grant summary judgment with respect to two remaining claims against Franklin–Lipsker, both of which charge that she conspired to present false testimony at Franklin's murder trial. Apart from those at issue in this appeal, no claims remain against Morse, Cassandro, Murray, and Cuneo.

2. Fed.R.Civ.P. 54(b) provides: "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgement." Pursuant to Rule 54(b), the district court may sever particular claims for immediate appeal as long as it states expressly that there is no just reason for delay. We accord great deference to a district court's decision to enter a final judgment under Rule 54(b). *See James v. Price Stern Sloan, Inc.,* 283 F.3d 1064, 1068 n. 6 (9th Cir.2002); *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 797–98 (9th Cir. 1991).

3. All telephone conversations discussed in this opinion were taped. Unless otherwise indicated, details of the calls derive from transcripts of the audiotapes.

tation to report what she had seen as a child. Barry informed the inspector that the killer was a family member and that he had raped his own children. In the span between calls, the couple had spoken to family members who reportedly feared disruption and danger should the matter come to light. Barry reiterated fears that the killer would know his accuser's identity but would not go to jail. Attempting to reassure the caller, the inspector told him that prosecutors would not pursue a case they did not believe was strong: "[T]hey like a good case, and they're not gonna go unless they have a good, solid case, and they don't like sixty-percent cases. They like them about ninety-five, ninety-nine or a hundred percent . . . a sixty-percent case probably would never be taken into court."

On November 21, 1989—four days after the initial call—Barry and his wife (defendant Franklin–Lipsker, at that point referring to herself as "Mrs. Barry") called to give the inspector details about the crime, though not the perpetrator's name. The couple hoped the sheriff's office could locate whatever evidence might have remained in county files about the crime; Franklin–Lipsker would not divulge the killer's identity without some assurance that any possible prosecution would not rely solely on her testimony. In order to allow the inspector to consider whether she could, in fact, have been an eyewitness, Franklin–Lipsker told him the following:

- She had been in a car with the perpetrator when they picked Susan up across the street from her Foster city home.
- The threesome drove to "the woods . . . out towards Half Moon Bay." It was a pleasant, "autumnal" day.
- The killer raped Susan in the back of the car.
- After the rape, Susan was sitting on something elevated a "little tiny hill, or maybe it was a rock," fifteen to twenty feet from the car.
- The killer struck Susan on her head with a rock. Susan raised her hand to her head before the killer landed a second blow with the rock.
- She could not remember Susan's clothes, but thought she was wearing a dress. She recalled that the perpetrator did not remove Susan's clothes to rape her but simply pushed up her dress.
- The perpetrator made her help him put a mattress over the dead girl. He then pushed her to the ground and told her that if she told anyone what had happened, no one would ever believe her and that "they would say that I was a part of it. And that they would put me away . . . and that he would kill me if I ever talked about it."

Franklin–Lipsker promised to give the inspector all of the details if the ones she had provided proved consistent with the case file.

The next day, November 22, 1989, the inspector and Deputy District Attorney Murray informed Franklin–Lipsker that her information was "excellent" and "connect[ed] to everything" they knew about the case at that point. The inspector told Barry Lipsker, "all the information that we found leads us to believe that your wife was an eyewitness, she's being very truthful with us." Murray reassured Franklin–Lipsker, however, that the county would evaluate all the evidence and would not contact the suspect "until we make a determination that this is a prosecutable case." He cautioned that he could not guarantee a conviction and stressed that it was his ethical duty "not to file a criminal charge against someone unless I believe that there is sufficient evidence to prove beyond a reasonable doubt, the person's guilt." Franklin–Lipsker told Murray she had never read newspapers about the case

and had not discussed it with other people. She understood that if all her information was public knowledge, it would not be useful. Murray told her she had described details he believed "only a person who saw the crime would know." Both Murray and Franklin–Lipsker acknowledged the importance of leaving Franklin–Lipsker's recollection untainted; Franklin–Lipsker, in fact, got angry at her husband on the call when he asked for details about the crime.

Later the same day, in a sixth phone call, Franklin–Lipsker finally gave police her name and agreed to an in-person interview with Detectives Morse and Cassandro. She also revealed that the person she had seen kill Susan Nason was her father, George Franklin.

Franklin–Lipsker met with Morse and Cassandro on November 25, 1989. During their interview of her, Franklin–Lipsker offered a more detailed account of her recollection. She reported the following:

- Franklin was driving Franklin–Lipsker and her sister, Janice, to school in his Volkswagen van. They picked Susan up and Franklin made Janice get out of the car. It was a clear, fall day.
- Franklin told the two girls they were going to play "hookie." Franklin–Lipsker thought it was possible that the event took place after lunch rather than in the morning.
- The trio rode past the reservoirs, "like the way you would drive up towards Half Moon Bay." Franklin–Lipsker believed they were in the woods on a fire road. She recalled that the road was unpaved.
- A mattress larger than a twin lay in the back of the van.
- The girls played in the car. Franklin joined them, and eventually pinned Susan down on the mattress. He began "to rub back and forth on her, in a humping motion." Franklin–Lipsker saw that he had pushed up Susan's dress or skirt and that Susan wore something white underneath it.
- They were in an area where trees were "moderately dense." The trees "were not real big around."
- Franklin left the car, followed a while later by the two girls. Susan sat on "a point or a peak ... [or] a rock ... [or] something that was slightly elevated."
- Franklin–Lipsker saw her father holding a rock above his head with both hands. Susan raised her hands to her head as Franklin "crashed the rock down against her head where her hands were." He struck Susan a second time with the rock. The blow crushed a silver ring worn by Susan that had had a stone in it.
- Franklin–Lipsker ran. Her father grabbed her, held her face to the ground, and told her he would kill her if she ever told anyone. He also told her she would never be believed.
- Franklin made his daughter help him get the mattress out of the van. She did not recall watching what he did with the mattress.
- The two drove home without Susan. It was still light when they returned.

Franklin–Lipsker reported that she had told her therapist and some family members about the incident. She revealed that her mother, Leah Peluffo, told her she had concluded years earlier that Franklin had murdered Susan; Peluffo reportedly had even confronted her then-husband with her belief.

The detectives asked Franklin–Lipsker why she had not come forward earlier. She reported that her memory had become "very vivid ... not as vague." She did not tell them that she had, in fact, forgotten

about the incident for some twenty years.[4] Franklin–Lipsker also informed police that her father had molested her, raped her older sisters Janice and Kate, and had held her down while another man raped her. She reported that her father was violent with the whole family. In recent years, Franklin–Lipsker said her father had commented "that little girls are really sexy" and had joked about engaging in incest with Janice. The detectives expressed concern that she might have a vendetta against Franklin—a claim Franklin–Lipsker denied.

Prior to the in-person interview, Franklin–Lipsker had told Murray that she had undergone therapy "during the past twenty years." According to Morse's notes summarizing Murray's conversation with Franklin–Lipsker, "[t]he information she now brings forward concerning the facts of this murder are due to these therapeutic sessions." During the interview at her home, Franklin–Lipsker confirmed that she had been in therapy. In addition, Morse, Cassandro, and Franklin–Lipsker all recalled that she told the detectives that she had considered being hypnotized to help her lose weight, though she had never followed through on the idea. Cassandro's notes from the interview, however, suggest that Franklin–Lipsker may have told the detectives she *had* been hypnotized for weight loss. The notes included a final entry, added after the audiotape was turned off: "Wit/S hypnotized to lose weight."[5] However, no information from the interview indicates that Franklin–Lipsker's recovery of her memory about the murder resulted from hypnosis.

After the interview, Morse reported that he found Franklin–Lipsker to be a credible and compelling witness. In his deposition, Murray agreed, noting that—knowing about Franklin–Lipsker's long-time therapy—he had told Morse before the interview, "Look. If there's anything I want you to find out, find out if she's a nut." After an extensive interview with Franklin–Lipsker, Morse concluded she was not.

*Other Pre–Arrest Investigation*

San Mateo County Sheriff's Office records show that Morse and Cassandro took additional investigative steps after they interviewed Franklin–Lipsker on November 25, 1989 and before they arrested Franklin three days later.

*Coroner's Report and Case File*

Prior to Franklin's arrest, police reread the 1969 sheriff's and coroner's files on the case and checked the details against Franklin–Lipsker's statements. Consistent with Franklin–Lipsker's recollection about the ring, a sheriff's office report from December 2, 1969 noted that two rings—one missing a stone—remained on the skeleton. The coroner's report revealed that evidence collected at the site included a small section of a stone that appeared to match the ring. Also corroborating Franklin–Lipsker's statement, the 1969 coroner's investigation report noted that Susan's remains lay underneath an "old box spring mattress."

The coroner's file included a front page article from the *San Mateo Times* dated December 3, 1969, the day after Susan's body was found. The article stated that a skull fracture—possibly caused by a rock—killed the girl. Significantly, the ar-

---

**4.** Franklin–Lipsker claims she thought Barry had told them that her memory had not been present all her life, but had been "recovered."

**5.** At Franklin's criminal trial, Murray testified that Franklin–Lipsker told him about her

therapy as well. When he asked whether her therapist had hypnotized her, Murray recalled she replied, "No." Like the detectives, Murray recalled she admitted to having considered hypnosis for weight loss.

ticle did *not* indicate that Susan had been hit twice with the rock—a detail Franklin–Lipsker provided that corresponded with the case records. The article also reported that a ring was found, but did not indicate that the ring or Susan's hands had been crushed—information Franklin–Lipsker had been able to provide the police. The article also reported that Susan had been abducted between 3 and 4 p.m.—a detail at odds with Franklin–Lipsker's recollection that her father had picked Susan up either in the morning or after lunch.[6]

Franklin notes that several articles from the time of the murder provided some of the details Franklin–Lipsker proffered; however, those articles were not part of the coroner's file and Franklin puts forth nothing other than his own speculation to suggest that either the detectives or Franklin–Lipsker read any of the additional articles. Though police might have conducted further research, Franklin–Lipsker does appear to have provided details not contained in the newspaper accounts they read.

*Janice Franklin Interview*

The detectives interviewed Franklin–Lipsker's sister, Janice Franklin. Janice, who would have been nine or ten years old at the time of the murder, recalled the details of the day of Susan's disappearance somewhat differently from her sister. For example, she did not remember Susan getting into Franklin's van, though she thought she had "a feeling" about it. She also thought she had walked to school with Susan but did not recall whether she saw the younger girl after school. She remembered Susan wearing a blue dress with

daisies on it. Her memory of the Volkswagen van corresponded with Franklin–Lipsker's: The back seat had been removed and a bed had been put in its place. Sometime after Susan's disappearance, Janice noticed that the mattress was gone. She told detectives that Franklin enjoyed going for drives toward Half Moon Bay and elsewhere along Highway 92. She also reported having told her mother—correctly—where she believed Susan would be found.

Janice told the detectives that Franklin had liked Susan, and that she had witnessed him holding Susan and Eileen on his lap and having them play a game with his navel, as though "his body was the game." She confirmed that her father had molested her beginning when she was in the third or fourth grade. Janice reported that her father had attempted intercourse with her when she was in the seventh grade, and ultimately forced her to perform oral sex. She also recalled him molesting her older sister, Kate, with whom she shared a bedroom. She agreed with Franklin–Lipsker that Franklin had been violent toward his family.

On the evening Susan disappeared, Janice remembered coming home to find her father sitting strangely in the living room and saying hello to her in a way that frightened her. Janice reported that, when police called to speak to her about Susan a few days after the little girl had disappeared, her father kicked her so hard in the back that she fell on her face and suffered a permanent bone injury. She understood the kick as a threat not to talk to the police. She told the detectives that she found it odd that the subject of Susan's

---

6. In a declaration before the district court in the instant matter, Morse acknowledged that Franklin–Lipsker's account included "isolated discrepancies" with the investigation records, but said he did not find them remarkable "in view of the length of time since the events in question." He reported that he would have been concerned had such discrepancies been absent.

disappearance and murder was never mentioned in the Franklin household, despite the fact that Susan and Eileen had been best friends. Janice had had her own suspicions about Franklin's role in Susan's disappearance and murder. She · told Morse and Cassandro that she had called the police in 1984 to report her strong feeling that her father had been Susan's murderer; back in 1984—before Franklin–Lipsker came forward with her memories—the officers told Janice that she did not have enough information upon which they could follow up. Janice recalled her mother telling her that she also thought Franklin had killed Susan, though she had been too frightened to come forward.

### Police Arrest Franklin

In his affidavit in support of a search warrant for Franklin's home, Morse detailed his conversations with Franklin–Lipsker and Janice Franklin. He also discussed his conversation with a detective specializing in sexual crimes against children; based on what Morse told him, that detective concluded that, in his expert opinion, Franklin was a pedophile. This conclusion was significant, because Morse believed, in his opinion as a detective, that the killer would have been a pedophile whom Susan knew. Morse further indicated in the affidavit that he had read the newspaper articles in the coroner's files that did not mention the damaged hand or ring Franklin–Lipsker had described.[7] Based on this, he reported that Franklin–Lipsker knew information about the crime that only an eyewitness would know. Because he had an eyewitness he deemed credible and corroboration for much of her story, Morse believed he had probable

cause to conclude that Franklin murdered Susan.

Before confronting Franklin, the police also located Franklin's old van—which they found because Franklin–Lipsker had remembered the license number—and took several pictures and measurements of a platform in the back that might have held the mattress. They also interviewed Susan's parents. Mrs. Nason reported that she did not know the Franklin parents well, but she recalled that Franklin had made a sexual overture to her approximately one year after Susan's murder. The detectives also interviewed one of Franklin's ex-girlfriends.

When the police went to interview Franklin, they told him he was a suspect. He refused to let them interview him in his home but agreed to go to the police station with them. When the police told him they wanted to talk to him about information regarding the Susan Nason murder, he asked, "Have you talked to my daughters?" After Franklin refused to speak to the police and requested counsel, the detectives arrested him. Police executed a search warrant at Franklin's residence later that afternoon.

### Franklin–Lipsker's Jail Visit

In December 1989—several weeks after Franklin's arrest—Franklin-Lipsker decided she wanted to visit her father at the San Mateo County Jail. She wanted her father "to tell the truth and to confess." During a deposition, Franklin–Lipsker recalled that she contacted Murray at the District Attorney's office in order to find out whether she was allowed to visit her father.

---

7. As noted previously, had Morse been more diligent, he would have found articles providing the details Franklin–Lipsker offered. However, Franklin has produced nothing be-

yond speculation to suggest that Morse read any articles except those contained in the coroner's file prior to arresting Franklin.

Franklin–Lipsker reported that Murray told her he did not think it was a good idea but could not prevent her from visiting. In his deposition, Murray recalled that, "I told her I didn't have the power to tell her that she couldn't do it but please don't do it." Murray claimed he told Franklin–Lipsker he thought such a visit could harm the case. He remembered telling her that a jury would not understand why she would go visit him and that visiting him without a witness present could cause problems at trial should Franklin make allegations against his daughter.

In a book she co-authored about the case after Franklin's conviction, however, Franklin–Lipsker told a different story. In *Sins of the Father*,[8] Franklin–Lipsker recalls that Murray supported the visit: "Marty [Murray] seemed surprised at my determination, but said he didn't think it was such a bad idea. He repeated that he could not ask me to do it." *Franklin v. Duncan*, 884 F.Supp. at 1445. After the trial, Murray indicated that he did not recall whether or not he told Franklin–Lipsker if it was a good idea to try to obtain Franklin's confession. *Id.*

Whatever Murray's wishes or warnings may have been, Franklin–Lipsker told the prosecutor she wanted to visit in order to persuade her father not to put the family through a trial. According to Murray, he refused her request that he arrange the jail visit for her, though he said he would look into getting information for her regarding visiting outside ordinary visiting hours. Murray reported that he called the jail and spoke with defendant Cuneo, a jail official, who told Murray he needed to know the name of the prisoner in question to be certain he could receive visitors. Once Cuneo confirmed that Franklin could

have visitors, Murray told him a witness was traveling from out of town who could not come during ordinary visiting hours. Cuneo replied that the jail permitted non-visiting hour visits from out-of-town guests. According to Murray, Cuneo told him Franklin–Lipsker should contact him or "whoever the on-duty sergeant is." He assured Murray that, if the call came to him, he would take it.

Murray recalled Cuneo asking him whether the interview should be in the attorney room or in the ordinary visitor area. Murray reportedly replied, "Treat her the way you would treat any other witness. This is not a request on behalf of the district attorney's office." He claimed he also told Franklin–Lipsker, "If you decide to do this, you're doing this on your own; this has nothing to do with the district attorney's office."

In *Sins of the Father*, however, Franklin–Lipsker apparently painted a different picture: She reported that when she called the jail, she "was immediately put through to the man in charge, Sergeant Cuneo" and was told she could visit outside normal visiting hours. *Franklin v. Duncan*, 884 F.Supp. at 1445.

At Franklin's trial, Franklin–Lipsker testified that her father responded to her pleas that he tell the truth by refusing to speak and pointing to a sign indicating that "Conversations May Be Monitored." *Id.* Franklin–Lipsker's visit to the jail took center stage again during closing argument at Franklin's state trial. Prosecutor Elaine Tipton—who took over the trial from defendant Murray and who has been dropped from this case based on her absolute prosecutorial immunity—referred repeatedly to the fact that Franklin refused

---

8. Eileen Franklin & William Wright, *Sins of the Father* (1991). Although it is discussed at various points in the witnesses' depositions and described in the habeas decision, Franklin–Lipsker's book is not part of the record in this case.

to speak during the visit and instead remained silent. *See Franklin v. Duncan*, 70 F.3d at 76–78. (reprinting the offending portions of Tipton's closing argument). In his deposition, Franklin acknowledged that he said nothing in his meeting with Eileen, but instead pointed to the sign.

*Franklin Wins Habeas Relief*

Franklin received a life sentence after a jury convicted him of first degree murder. *Franklin v. Duncan*, 884 F.Supp. at 1439. After exhausting his state post-conviction remedies, he petitioned in federal district court for a writ of habeas corpus. *Id.*

The state appeals court found that Franklin–Lipsker acted at least with "the blessing" of the district attorney's office when she had her jailhouse visit with Franklin, whose Fifth Amendment rights had attached and who was represented by counsel. *Franklin v. Duncan*, 884 F.Supp. at 1445. The federal district court found that the prosecution violated Franklin's Fifth Amendment rights at trial. The court reasoned that by pointing to the sign warning that conversations could be monitored, Franklin invoked his right to remain silent and to refuse to speak to the government. *Id.* at 1447.

The federal habeas court also found that Franklin–Lipsker's visit to the jail and the circumstances surrounding it violated Franklin's Sixth Amendment rights. Specifically, the court, citing *Massiah v. United States*, 377 U.S. 201, 205–06, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), found that the government had violated Franklin's right to be free of interrogation by a government agent in the absence of his counsel. *Franklin v. Duncan*, 884 F.Supp. at 1450–1451. The court found that Franklin–Lipsker's visit to her father presented a close question: "If the government directs an individual to elicit incriminating statements from a defendant, the sixth amendment is violated. If, by contrast, the state obtains incriminating statements 'by luck or happenstance,' the sixth amendment is not violated.... The actual facts of the case fall somewhere in between." *Id.* at 1451 (citations omitted).

The district court ultimately concluded that the government's involvement in Franklin–Lipsker's visit was "sufficiently extensive" to constitute a *Massiah* violation. *Id.* The court found that Murray had, in fact, told Franklin–Lipsker that her plan was "not a bad idea." The court also noted that Murray provided her with contact information for Cuneo and met with her just before she visited the jail. *Id.* The district court found that Cuneo made special arrangements for Franklin–Lipsker when he realized who she was. *Id.* The government had thus lent Franklin–Lipsker both moral and practical support; in so doing, it had involved itself improperly in a private individual's questioning of a person in the state's custody. *Id.* According to the habeas court, "[a]t the very least, the state knowingly exploited an opportunity to question petitioner outside the presence of counsel." *Id.* at 1452. Thus, the government had violated Franklin's Sixth Amendment rights. *Id.*

The court concluded that violations of Franklin's constitutional rights—including the Sixth Amendment violation that occurred as a result of the government's involvement in Franklin–Lipsker's visit to the jail—required that Franklin's conviction be vacated and that he be granted a writ of habeas corpus. *Id.* at 1456. Thereafter, Franklin filed the case that is the subject of this appeal.

## II. STANDARDS OF REVIEW

■ We review a district court's grant of summary judgment, determination of qualified immunity, and probable cause findings de novo. *Delta Savings Bank v.*

*United States,* 265 F.3d 1017, 1021 (9th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 816, 151 L.Ed.2d 700 (2002) (summary judgment); *Robinson v. Prunty,* 249 F.3d 862, 865–66 (9th Cir.2001) (qualified immunity); *United States v. Buckner,* 179 F.3d 834, 837 (9th Cir.1999) (probable cause).

## III. ANALYSIS

### A. Probable Cause: Franklin v. Morse, Cassandro, and Franklin–Lipsker

Franklin alleges that defendants Morse, Cassandro, and Franklin–Lipsker conspired to arrest him without probable cause. Specifically, Franklin claims (1) that Franklin–Lipsker's memories surfaced as a result of hypnosis and that the detectives were aware of this fact; (2) that the officers knew that all of the details Franklin–Lipsker "remembered" correctly had appeared in 1969 news stories about the Nason murder; (3) that the officers "suppressed" evidence that Franklin–Lipsker had been arrested for cocaine possession and prostitution and that she had tried to expunge her record—facts Franklin alleges should have made her a non-credible witness for purposes of establishing probable cause; and (4) that the officers "falsified" a statement Franklin made just prior to his arrest.

### 1. Morse and Cassandro's Qualified Immunity

■ Detectives Morse and Cassandro contend they are entitled to qualified immunity with regard to Franklin's claims that they did not have probable cause to arrest him. Qualified immunity protects government officials from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396

(1982). If an official could reasonably have believed her actions were legal in light of clearly established law and the information she possessed at the time, she is protected by qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001) (en banc). Thus, a two-part test controls our qualified immunity analysis. First, we must determine whether the law that governs the official's conduct was clearly established. Second, we must consider whether a reasonable officer could have believed the conduct was lawful. *Katz,* 533 U.S. at 201–02, 121 S.Ct. 2151; *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993). This standard protects " 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Our qualified immunity analysis is "essentially legal" and is appropriately made on summary judgment where the underlying facts are undisputed. *Act Up!/Portland,* 988 F.2d. at 873.

■ In this case, because Morse and Cassandro claim qualified immunity from Franklin's challenge to their probable cause to arrest him, we must ask "whether 'a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Mendocino Envtl. Ctr. v. Mendocino County,* 14 F.3d 457, 462 (9th Cir. 1994) (quoting *Hunter,* 502 U.S. at 228, 112 S.Ct. 534). Our inquiry is an objective one, based on what a reasonable officer would believe if faced with the "facts and circumstances" actually known to the officer in question. *Id.* The parties do not dispute that existing law at the time of Franklin's arrest clearly established that he could not be arrested in the absence of

438

probable cause. We must therefore only determine whether, viewing all evidence in the light most favorable to Franklin, Morse and Cassandro reasonably could have believed they had probable cause for an arrest.

■ Probable cause exists when police have knowledge at the moment of arrest of facts and circumstances based on reasonably trustworthy information that would warrant a belief by a reasonably prudent person that the person arrested has committed a criminal offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Buckner,* 179 F.3d at 837. The evidence need support "only the probability, and not a prima facie showing, of criminal activity," *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and such evidence need not be admissible, but only legally sufficient and reliable. *Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

■ If they reasonably believed that the information they had received from Franklin–Lipsker, Janice Franklin, and the coroner's and sheriff's files was reliable, Morse and Cassandro had sufficient facts to establish probable cause to arrest Franklin. Because Morse and Cassandro moved for summary judgment, they bear the burden of demonstrating the absence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Because Franklin, as plaintiff, would bear the burden of proof on the relevant issues at trial, Morse and Cassandro need only show "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548; *see also Devereaux,* 263 F.3d at 1076.

As discussed, Morse and Cassandro began their investigation with information gleaned from six telephone calls with Franklin–Lipsker and her husband. Although she was initially reluctant, Franklin–Lipsker ultimately revealed her identity and agreed to an in-person interview with the detectives. Before the interview, Morse and Cassandro checked Franklin–Lipsker's information against information in the sheriff's and coroner's files and found that she possessed information they believed was not known to the public. Specifically, Franklin–Lipsker knew that Susan's ring and fingers were crushed, that the ring had held a stone, and that Susan had been struck twice on the head. Franklin–Lipsker's memory was also generally correct regarding the body's location off Highway 92. Although there were some discrepancies between Franklin–Lipsker's account and the case file—in particular regarding the time of day when the events occurred and the proximity of the body to the road—this court asks only whether the officers reasonably could have believed that such discrepancies could be expected in an eyewitness account after twenty years given by an eyewitness who had been just eight years old at the time of the event. Morse and Cassandro indicated that they scrutinized Franklin–Lipsker's allegations, supporting facts, and motives. After extensive phone conversations and an in-person interview, the detectives found Franklin–Lipsker to be credible and "reasonably trustworthy." As discussed below, Franklin offers no evidence to show that this credibility assessment was unreasonable.

Moreover, Morse and Cassandro did not rely solely on Franklin–Lipsker's recollection. They verified certain information about the day of Susan's disappearance with Janice Franklin, who was also able to corroborate Franklin–Lipsker's claim that her father was a violent pedophile who had sexually abused Janice and another sister. Janice reported having seen her father

engage in inappropriate physical play with Susan, who visited the Franklin household frequently before her disappearance. Janice also shared her own suspicions of her father's guilt, based in part on his violence toward her when police sought her assistance in 1969. Janice Franklin's information backed up Franklin–Lipsker's story and coincided with what the police believed would be true: that Susan's killer was a pedophile whom she knew.

On its face, the evidence available to the police before Franklin's arrest—if "reasonably trustworthy"—was sufficient for a reasonable officer to conclude that there was probable cause to arrest Franklin. In order to survive summary judgment, then, Franklin must demonstrate that there are genuine disputes of material fact as to what information the officers possessed at the time of Franklin's arrest. *Act–Up/Portland*, 988 F.2d at 873. Thus, Morse and Cassandro are entitled to qualified immunity unless Franklin can identify evidence from which a factfinder could conclude that the officers did not reasonably believe that they had probable cause to arrest Franklin. We conclude, as we explain below, that Franklin has not raised any issue of material disputed fact regarding the reasonableness of Morse's and Cassandro's belief in their probable cause to arrest him, and therefore we affirm the district court as to Franklin's claims against them.

### a. Hypnotically–Induced Evidence

■ Franklin first alleges that there is a genuine dispute over whether (a) Franklin–Lipsker recovered her memory of Susan's murder under hypnotherapy and (b) whether Morse and Cassandro knew that to be true. California law, in 1989, clearly established that "the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events." *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354, 1384 (1982). Franklin therefore reasons that if Morse and Cassandro knew that Franklin–Lipsker remembered the murder only as a result of hypnosis then they could not base their probable cause determination on her recollections.[9] In support of his claim that Franklin–Lipsker's memories were induced during hypnosis, Franklin points to evidence that prior to contacting the police Franklin–Lipsker had told her brother and other family members that she had recovered her memories under hypnosis. He also cites to the habeas court's finding that an attorney had told Franklin–Lipsker that she would be an "invalid witness" if she had been hypnotized. Franklin also states that Janice Franklin admitted under oath in 1996 that both she and Franklin–Lipsker had undergone hypnotherapy prior to Franklin's arrest and had lied about it.

Resolving all permissible inferences in Franklin's favor, the court could easily find—as did the district court—"ample evidence" that Franklin–Lipsker recovered her memories about the murder under hypnosis. (Franklin–Lipsker, for her part, continues to deny that she was ever hypnotized for any purpose.) But in order to sustain his burden on summary judgment, Franklin must present evidence sufficient to raise a genuine issue of fact whether Morse and Cassandro *knew* at the time of Franklin's arrest that Franklin–Lipsker recovered memories of the murder as a result of hypnosis.

---

**9.** As noted previously, when making a probable cause determination officers may rely on evidence that would not be admissible at trial. *Franks*, 438 U.S. at 165, 98 S.Ct. 2674.

Franklin has not adduced such evidence. Franklin–Lipsker, Morse, and Cassandro all agree that during their November 25, 1989, conversation Franklin–Lipsker admitted only to having considered hypnosis for weight loss—*not* actually to undergoing hypnosis and, as a result, to recovering her memories of Susan's murder. Assistant District Attorney Murray corroborates this account. The only evidence that Franklin has presented to indicate that the police were aware that Franklin–Lipsker had been hypnotized is a note from Cassandro that "Wit/S hypnotized to lose weight." Even construing this note in a light most favorable to Franklin does not demonstrate that the detectives were—or should have been—aware that Franklin–Lipsker might have discussed or remembered *the murder* under hypnosis: Weight loss and murder are not naturally connected topics, and we cannot fault the detectives for not making such a connection.

*b. Availability of Details in Media Accounts*

Next, Franklin argues that Franklin–Lipsker's "memories" are not credible because all of the details she provided to police were available in media accounts from 1969. But here again, Franklin fails to offer evidence sufficient to raise a genuine issue of material fact with respect to the qualified immunity inquiry.

Although Franklin has produced contemporaneous articles containing additional details about the crime, he offers no evidence—other than speculation—that the officers actually *read* those articles prior to his arrest. Our qualified immunity analysis turns on what reasonable officers could conclude based on the information available to Morse and Cassandro at the time of the arrest. *Buckner,* 179 F.3d at 837. The articles in the coroner's file did not contain information about Susan's crushed hand and ring. And Franklin does not dispute that Franklin–Lipsker herself told Morse and Cassandro that she had not read any media accounts of the murder. Moreover, Franklin–Lipsker indicated that she tried to avoid learning details that might taint her memory. Although Morse and Cassandro might have been more diligent by conducting a thorough newspaper search of all articles about Susan's murder, they were reasonable to conclude that, based on the information they possessed, Franklin–Lipsker knew of non-publicized facts.

*c. "Suppression" of Franklin–Lipsker's Arrest Record*

Franklin maintains that Morse and Cassandro conspired with Franklin–Lipsker to suppress records showing that she had been arrested for prostitution and cocaine possession. Although suppression of any such information might have affected Franklin's ability to impeach Franklin–Lipsker at trial, it is not relevant to the probable cause and qualified immunity determinations.

Our determination of whether Morse and Cassandro possess qualified immunity for their determination of probable cause to arrest Franklin hinges only upon the information police possessed at the time of Franklin's arrest. Assuming the police knew of Franklin–Lipsker's record prior to Franklin's arrest—and the record does reflect that the officers were at least aware of her prior cocaine use—Franklin has not shown that the evidence undermines the officers' credibility assessment or renders Franklin–Lipsker's memory suspect for the purpose of determining probable cause. Franklin–Lipsker's record of prostitution and cocaine use, while unseemly, does not automatically cast any doubt on her ability to recall and credibly report on

a wholly unrelated event, such as the murder—and Franklin has failed to present evidence that might tend to show that Franklin–Lipsker's history had any such deleterious effect. Therefore he has failed to raise a genuine issue of fact for trial.

### d. Franklin's Statement to Police

██ Morse and Cassandro reported that, when they told Franklin they were investigating Susan Nason's murder, he asked if they had spoken with his daughter or daughters. Franklin argues that the officers could not base an arrest on this question, particularly as it was a reasonable query since Susan had been Franklin–Lipsker's best friend.

Once again, Franklin does not raise a genuine issue of material fact with respect to probable cause. Morse's affidavit in support of a search warrant stated that the detective already believed that probable cause existed for arrest before the detectives ever visited Franklin. Assuming Franklin had never uttered a word, the record—including Franklin–Lipsker's statements, Janice Franklin's interview, the sheriff's and coroner's files, and an expert's determination that Franklin was a pedophile—could lead a reasonable officer to believe there was probable cause for arrest.

In sum, Franklin has not met his burden at summary judgment of adducing evidence from which a reasonable jury could find that Morse and Cassandro did not reasonably believe that they had probable cause to arrest him. Accordingly, the district court was correct to hold that they enjoyed qualified immunity as to Franklin's claims against them.

### 2. Eileen Franklin–Lipsker's Liability

██ Franklin's claim against Franklin–Lipsker on the issue of probable cause is based on the theory that she conspired with Morse and Cassandro to violate his constitutional right to be free of arrest without probable cause. Franklin has framed this claim under 42 U.S.C. § 1983. A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor. *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 783 (9th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 545, 151 L.Ed.2d 423 (2001). To prove a conspiracy between the police and Franklin–Lipsker under § 1983, Franklin must show "an agreement or 'meeting of the minds' to violate constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir.1989) (quotations omitted). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.* at 1541.

Franklin has failed to provide any evidence that Morse and Cassandro conspired to violate Franklin's constitutional rights, much less that they entered such a conspiracy with Franklin–Lipsker. Because the officers did, in fact, have probable cause to arrest Franklin, Franklin's claim against his daughter with respect to probable cause fails. Furthermore, even if probable cause did not exist, Franklin has offered no evidence to support a finding that Franklin–Lipsker engaged in any sort of conspiracy with the detectives that could expose her to liability. To the contrary the only evidence strongly suggests otherwise: Franklin–Lipsker, despite her ill will towards her father, refused even to identify herself (much less her father) until she had engaged in several conversations with the police. She was unwilling to move forward unless police believed they could build a credible case. Franklin–Lipsker is, therefore, entitled to summary judg-

ment with respect to Franklin's probable cause claim.

### B. Sixth Amendment Claim: Franklin v. Murray, Cuneo, and Franklin–Lipsker

In the *Franklin v. Duncan* federal habeas proceeding, the district court concluded and this court affirmed that Franklin–Lipsker's jailhouse visit and interrogation—arranged by Assistant District Attorney Murray—violated Franklin's Sixth Amendment right to be free of interrogation by a government agent in the absence of counsel, as articulated in *Massiah v. United States. See Franklin v. Duncan*, 884 F.Supp. at 1435, *aff'd*, 70 F.3d at 75; *see also United States v. Henry*, 447 U.S. 264, 273, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) ("[T]he concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government.").

As the district court concluded, based on the record a reasonable factfinder could find that:

- Franklin–Lipsker called Murray in December 1989 and asked if it would hurt the prosecution if she spoke to her father in an effort to convince him to plead guilty.
- Murray agreed that it would be better if Franklin pled guilty, and told Franklin–Lipsker a visit was "not a bad idea," although he could not ask her to go.
- Franklin–Lipsker asked Murray to get her information about visiting the jail during non-standard visiting hours. Murray agreed to get the information, and subsequently contacted Sergeant Cuneo at the San Mateo County Jail.
- Murray informed Cuneo that a witness wanted to visit Franklin. Cuneo told Murray to have the witness contact him to arrange for a visit outside of normal visiting hours.
- Murray called Franklin–Lipsker back and provided her with Cuneo's telephone number.
- Franklin–Lipsker called Cuneo, who arranged for a visit at a special time.
- Franklin–Lipsker met Franklin in the jail without his lawyer present.
- Just before and just after the visit, Franklin–Lipsker met with Murray in the District Attorney's office. The two discussed Franklin–Lipsker's meeting with her father.

From these facts, a reasonable factfinder could conclude that Murray knew that Franklin–Lipsker planned to try to convince her father to confess, and that he facilitated her visit by mediating with Cuneo. Based on these facts, this court's prior affirmance in *Franklin v. Duncan* compels a finding that Franklin–Lipsker's visit violated Franklin's Sixth Amendment rights. The question remains whether the defendants may be held liable under § 1983.

### 1. Murray & Cuneo: Qualified Immunity

 Murray and Cuneo argue that they are entitled to qualified immunity. To determine whether they are correct, we engage in the same analysis as we did with respect to Morse and Cassandro on Franklin's probable cause claim. The law was clearly established at the time of the events in question that neither the government nor its agents could interrogate a prisoner out of the presence of counsel; therefore, we need only consider whether a reasonable official in Murray's and Cuneo's positions could believe their conduct to be lawful. *Katz*, 533 U.S. at 202, 121 S.Ct. 2151; *Devereaux*, 263 F.3d at 1074. As

the Supreme Court held in *Anderson v. Creighton*, "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted).

Franklin relies on the Supreme Court's holding in *Maine v. Moulton* that "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

*Moulton*, however, is distinguishable. In that case, a co-defendant who elicited evidence had entered an express agreement with the state to operate as an undercover agent of the prosecution. Here, Franklin offers no evidence of any sort of agreement. The record is clear that Murray did not approach Franklin–Lipsker to ask for her assistance and did not offer Franklin–Lipsker anything in exchange for her visit to her father. As the court noted in *Franklin v. Duncan*, Murray's conduct fell somewhere between asking Franklin–Lipsker to obtain her father's confession in the absence of counsel—a clearly illegal act—and happening to find out about it after Franklin–Lipsker made an independent visit. The District Court's discussion of the Eighth Circuit's decision in *United States v. Surridge*, 687 F.2d 250 (8th Cir. 1982), is entirely on point. In *Surridge*, an individual called the sheriff to arrange to visit the accused in pretrial detention. The visitor told the sheriff that he might be able to find out where the defendant had hidden money stolen in a bank robbery. Unbeknownst to the visitor, the sheriff unsuccessfully attempted to tape the two men's visit. The visitor nonetheless related to the sheriff information revealed by the defendant during the visit. *Id.* at 252. As in the case at issue here, the government never offered the visitor anything for his information, never told him what to say to the defendant, and never entered into an explicit agreement with him. *Id.* The Eighth Circuit found no Fifth or Sixth Amendment violations. *Id.* at 255.

Although we are bound by the court's holding in *Franklin v. Duncan* that Franklin suffered a Sixth Amendment deprivation, we conclude that a reasonable official in Murray's position could have believed that his actions did not violate Franklin's Sixth Amendment rights. As the Supreme Court stressed in *Saucier v. Katz*, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made." 533 U.S. at 205, 121 S.Ct. 2151. By virtue of the decisions in *Franklin v. Duncan*, it is now a matter of clearly-established law in this circuit that facilitation of an interrogation such as that provided by Murray is unlawful. At the time Murray acted, however, an official may have reasonably believed the opposite to be true. Therefore, Murray is entitled to qualified immunity.

 As to the claim against Cuneo, Franklin offers no evidence that Cuneo had any idea that Franklin–Lipsker intended to seek a confession from her father. Possessing the information he had at hand—that Franklin's daughter wanted to visit him and that she was to be treated as any other witness—Cuneo reasonably could have believed that arranging for a non-visiting hours visit (a service the jail often provided out-of-town visitors) did not

violate Franklin's Sixth Amendment rights. Franklin offers no facts to suggest that Cuneo knew more than he asserts or that he gave Franklin–Lipsker access and accommodations not ordinarily afforded to other visitors.

### 2. *Franklin–Lipsker: State Action & Proximate Cause*

▆ Although Murray is entitled to qualified immunity, Franklin–Lipsker, a private individual, is not. *See Wyatt v. Cole*, 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (private persons are not entitled to qualified immunity under § 1983). The district court found it perverse that Franklin–Lipsker, a non-lawyer with no cause to understand the nuances of Sixth Amendment jurisprudence, could be liable where the prosecutor enjoyed immunity. The district court therefore recognized a "good faith defense" for private defendants in §1983 actions. The Supreme Court has never foreclosed the possibility that a private defendant like Franklin–Lipsker—with no recourse to the reasonableness inquiry of a qualified immunity defense—"could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens." *Wyatt*, 504 U.S. at 169, 112 S.Ct. 1827. However, we need not reach the question of whether such a defense is available because we conclude (1) that Franklin–Lipsker was not acting under color of state law when she visited her father in jail, and (2) that she was not the proximate cause of her father's Sixth Amendment injury.

▆ Section 1983 imposes civil liability on an individual who "under color [of state law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. A civil rights plaintiff suing a private individual under § 1983 must demonstrate that the private individual acted under color of state law; plaintiffs do not enjoy Fourteenth Amendment protections against "private conduct abridging individual rights." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Section 1983 liability attaches only to individuals "who carry a badge of authority of a State and represent it in some capacity." *Monroe v. Pape*, 365 U.S. 167, 172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled in part by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. This may occur ... sometimes if [the State] knowingly accepts the benefits derived from unconstitutional behavior." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). Constitutional standards should be invoked only "when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n.*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quotations omitted) (emphasis in original).

▆ A § 1983 plaintiff therefore must show that a defendant's actions are "fairly attributable" to the government. *Collins v. Womancare*, 878 F.2d 1145, 1151 (9th Cir.1989). A private individual's action may be "under color of state law" where there is "significant" state involvement in the action. *Johnson v. Knowles*, 113 F.3d 1114, 1118 (9th Cir.1997). The

Supreme Court has articulated four tests for determining whether a private individual's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test. *Id.* Only the joint action test is relevant here.

 Under the joint action test, "courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir.1995) (citing *Collins*, 878 F.2d at 1154). The test focuses on whether the state has " 'so far insinuated itself into a position of interdependence with [the private actor] that it must be recognized as a joint participant in the challenged activity.' " *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir.1989) (quoting *Burton*, 365 U.S. at 725, 81 S.Ct. 856). A plaintiff may demonstrate joint action by proving the existence of a conspiracy or by showing that the private party was "a willful participant in joint action with the State or its agents." *Collins*, 878 F.2d at 1154 (quotations omitted). To be liable as co-conspirators, each participant in a conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. *Phelps Dodge Corp.*, 865 F.2d at 1540–41. To be liable as a co-conspirator, a private defendant must share with the public entity the goal of violating a plaintiff's constitutional rights. *Id.; see also Gallagher*, 49 F.3d at 1453–54 (holding that public university's acquiescence in private security team's pat-down searches of concert-goers did not establish state action under joint action test, despite shared goal of producing a profitable event).

Our cases have been careful to require a substantial degree of cooperation before imposing civil liability for actions by private individuals that impinge on civil rights. For example, although we held in *Howerton v. Gabica*, 708 F.2d 380 (9th Cir.1983), that a landlord had engaged in joint action with police officers in the course of the landlord's sustained efforts to evict a tenant, we stressed that there was "more than a single incident of police consent to 'stand by' in case of trouble" and that the private defendants "repeatedly requested aid by the police to effect the eviction, and the police intervened at every step." 708 F.2d at 384–85; *see also Collins*, 878 F.2d at 1155.

Here, there is no evidence of any conspiracy or joint action between Franklin–Lipsker and Murray. Franklin offers no evidence that Franklin–Lipsker made repeated requests or solicited Murray's input on the types of questions she should ask her father. It is also undisputed that the jailhouse visit was Franklin–Lipsker's idea, and not a state-initiated effort to use her to extract her father's confession. Although the interview and its subsequent use against Franklin at trial violated *Massiah*, the government did not sufficiently insinuate itself into Franklin–Lipsker's jailhouse visit to transform her private actions into ones fairly attributable to the state. Indeed, Franklin has failed to offer any evidence to demonstrate that his daughter acted under color of state law when she visited him in jail.

 Furthermore, to the extent that Franklin aims to hold his daughter responsible for Murray's facilitation of the visit or trial prosecutor Tipton's use of his jailhouse silence against him at trial, his claim fails. In order for a private individual to be liable for a § 1983 violation when a state actor commits the challenged conduct, the plaintiff must establish that the private individual was the proximate cause of the violations. *King v. Massarweh*, 782

F.2d 825, 829 (9th Cir.1986). "[A]bsent some showing that a private party had some control over state officials' decision [to commit the challenged act], the private party did not proximately cause the injuries stemming from [the act]." *Id.*

*Arnold v. IBM Corp.*, 637 F.2d 1350 (9th Cir.1981), is instructive. There, a task force including law enforcement officials, the district attorney, and an IBM security manager investigated trade secret leaks from within IBM. After his arrest and indictment and the search of his home, the plaintiff sued IBM under § 1983 based on its involvement with the investigation. We held that, although IBM provided the task force with its security manager, information, funding, and grand jury witnesses, the company was not the proximate cause of the plaintiff's alleged injuries because it did not direct the task force to take action against him. *See id.* at 1356–58.

Here, there is no evidence that Murray and Tipton were under Franklin–Lipsker's control or that they failed to exercise their own independent judgment when they violated Franklin's rights. Murray's response to Franklin–Lipsker's request for help to visit her father and to offer her advice as to the advisability of a visit did not turn Franklin–Lipsker into a facilitator or a cause of the state's violation. With respect to the violation at trial, one of the bases upon which Franklin's conviction was overturned, there is no evidence that Franklin–Lipsker was even aware of Tipton's decision to allude to Franklin's silence during the jail visit as evidence of his guilt. We conclude that Franklin–Lipsker did not proximately cause the injuries Franklin sustained as a result of the actions of Murray and Tipton and she is not liable to her father for those injuries under § 1983.

## IV. CONCLUSION

Detectives Morse and Cassandro possessed sufficient evidence to permit a reasonable officer to conclude that probable cause existed to arrest Franklin. Franklin has failed to prove that there is a genuine issue of material fact that could lead a reasonable jury to conclude that Franklin–Lipsker conspired with the detectives to have her father arrested without probable cause. Murray and Cuneo are entitled to qualified immunity with respect to the Sixth Amendment violations that ultimately led to Franklin's release from prison. Franklin–Lipsker did not act under color of state law and was not the proximate cause of any injury sustained by Franklin as a result of the actions of the state officials; therefore, she is not liable to her father under § 1983.

The judgment of the district court is AFFIRMED.